UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————

CHESTNUT HILL NY, INC., JAE CURTIS,
THOMAS RIKER, and JOHN STURM,

                            Plaintiffs,

-against-

THE CITY OF KINGSTON, NY; THE CITY OF
KINGSTON ZONING BOARD OF APPEALS;
THE CITY OF KINGSTON PLANNING BOARD;
STEVEN NOBLE, INDIVIDUALLY AND IN HIS
CAPACITY AS MAYOR OF THE CITY OF
KINGSTON; SUZANNE CAHILL, INDIVIDUALLY
AND IN HER CAPACITY AS CITY PLANNER FOR
THE CITY OF KINGSTON; STEPHAN KNOX,
INDIVIDUALLY AND IN HIS CAPACITY AS CODE
ENFORCEMENT OFFICER AND/OR BUILDING
INSPECTOR FOR THE CITY OF KINGSTON;
BARTEK STARODAJ, INDIVIDUALLY AND IN
HIS CAPACITY AS DIRECTOR OF HOUSING
INITIATIVES FOR THE CITY OF KINGSTON;
EGIDIO TINTI, INDIVIDUALLY AND IN HIS CAPACITY
AS CHIEF OF POLICE OF THE CITY OF KINGSTON;
ERIC J. VANALLEN, INDIVIDUALLY AND IN HIS
CAPACITY AS SERGENT ON THE CITY OF KINGSTON
POLICE DEPARTMENT,

                         Defendants.
———————————————————————

**COMPLAINT**
**JURY TRIAL**
**DEMANDED**

Case No.  1:25-cv-368 (BKS/DJS)

**NATURE OF THE ACTION**

      1.    Plaintiffs bring this action under federal and state law to challenge the City of

Kingston's discriminatory and unconstitutional actions targeting Chestnut Hill NY, Inc., a

congregate living facility for elderly and disabled individuals. This action is brought pursuant to:

1

a. **The Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq.**, prohibiting housing discrimination based on disability and prohibiting retaliation against those who raise FHA-related claims;

b. **The Americans with Disabilities Act (ADA), 42 U.S.C. § 12132**, which protects individuals with disabilities from discrimination by public entities by requiring public officials and agencies to provide reasonable accommodations to disabled persons and prohibits retaliation against those who raise ADA-related claims;

c. **42 U.S.C. § 1983**, for violations of constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments, including the rights of Due Process and Equal Protection and the right to be free from unlawful searches and seizures;

d. **New York State Law**, including Article I, § 11 of the New York Constitution and Article 15 of the New York Executive Law (New York's Human Rights Law), which provide additional protections against discrimination;

e. **42 U.S.C. § 1988**, allowing for the recovery of attorneys' fees in civil rights cases.

2.      Plaintiffs Chestnut Hill and three residents of its congregate living facility with recognized substantial limitations on one or more major life activities and who are therefore "handicapped" within the meaning of the FHA and/or "disabled" under the ADA, seek declaratory and injunctive relief, as well as compensatory and punitive damages, due to the City of Kingston's ongoing campaign of discriminatory zoning decisions, discriminatory building code enforcement, unlawful searches and seizures, and unconstitutional retaliation:

a. The imposition of discriminatory and arbitrary zoning conditions and restrictions that single out Chestnut Hill and/or its disabled residents for disparate treatment under the city code;

b. The City's refusal to accommodate individuals with disabilities in violation of the FHA and ADA;

c. More than a dozen unlawful searches and seizures, including warrantless and pre-dawn police raids designed to harass and displace vulnerable residents;

   d. Retaliation against Plaintiffs for seeking legal redress, in violation of the First Amendment, the FHA, and the ADA's non-retaliation requirements;

   e. The City's pattern and practice of disability-based discrimination, including the use of pretextual code enforcement actions to dismantle Chestnut Hill's operations, and the adoption of new, but equally discriminatory zoning rules.

  3. Plaintiffs ask this Court to declare unlawful and enjoin Defendants' discriminatory policies and practices, including annulling sections of the Kingston Zoning Code that discriminate against and/or impose disparate burdens on disabled residents. Plaintiffs further seek damages for the harm inflicted by Defendants' unconstitutional conduct, including the emotional and physical distress suffered by Chestnut Hill's residents.

**SUMMARY OF THE CASE**

  4. Chestnut Hill NY, Inc. operates a group home and congregate living facility at 106 W. Chestnut Street in Kingston, NY, which has been the subject of multiple legal disputes: (i) *Chestnut Hill NY, Inc. v. City of Kingston* ("*Chestnut Hill I*"), No. 1:17-cv-0095 (BKS/DJS), 2017 U.S. Dist. LEXIS 226807 (N.D.N.Y. Feb. 22, 2017) (Sannes, CJ) (noting overt animus by (*inter alia*) city mayor; granting temporary restraining order); (ii) *Chestnut Hill NY, Inc. v. City of Kingston* ("*Chestnut Hill II*"), 1:23-cv-1024 (BKS/DJS), 698 F. Supp. 3d 399 (N.D.N.Y. Oct. 13, 2023) (Sannes, CJ) (denying Plaintiffs' motion for temporary restraining order and preliminary injunction); (iii) *Chestnut Hill II*, 2023 U.S. Dist. LEXIS 208807 (N.D.N.Y. Nov. 21, 2023) (Stewart, MJ) (requiring "John Doe" Plaintiffs to identify themselves); (iv) *Chestnut Hill II*, 2024 U.S. Dist. LEXIS 123608 (N.D.N.Y. Jul. 15, 2024) (Sannes, CJ) (finding complaint states a cause of action for prohibited discrimination under the FHA, "it was plausible to infer disability bias from disability-based comments by individuals at the public hearing and that there was no credible justification for at least one of the findings [of code violations]").

5.    In *Chestnut Hill I* (2017), this Court found evidence of discrimination by city officials and issued a temporary restraining order (TRO) preventing eviction. The case was later stayed as Chestnut Hill pursued land use approvals, during which the Court renewed the TRO 18 times.

6.    In 2018, the city determined that Chestnut Hill's group living arrangement required a use variance. In addition to granting the use variance, the zoning board, at the request of Defendant Cahill and Platte, imposed the requirement to also obtain a special permit, when none was otherwise required by the zoning code then in effect for that use at that location.  The city then filled the special permit with discriminatory conditions, including restrictions on signage, an owner-occupancy mandate, and excessive inspection obligations.

7.    Despite Chestnut Hill successfully renewing the special permit in 2020, 2021, and 2022, the City denied renewal in 2023, citing pretextual zoning code violations *Chestnut Hill II*, filed in 2023, challenges these actions as violations of the Fair Housing Act (FHA), Americans with Disabilities Act (ADA), and constitutional protections. This Court found plausible claims of disability-based discrimination.

8.    Following the commencement of *Chestnut Hill II*, which challenges these actions as violations of the Fair Housing Act (FHA), Americans with Disabilities Act (ADA), and constitutional protections, the City escalated its alleged zoning enforcement inspections, even after the planning board withheld Chestnut Hill's special permit.

9.    This abuse included several pre-dawn police raids where residents were literally turned from their beds and made to gather like cattle in the building foyer while Defendant Tinti and others berated them, the imposition of excessive fines based on pretextual or minor code violations that would otherwise go unpunished, and the most draconian tactic of all: shutting off

the facility's water supply for three months—a tactic that left disabled residents in extreme hardship.

10.     Meanwhile, in a parallel state court case, the City sought a permanent injunction against Chestnut Hill's operations but faced judicial pushback, including potential sanctions for unreasonable conduct. To date, that Court has (i) largely denied the city's motion for a preliminary injunction, except to prohibit new residents taking refuge at Chestnut Hill; and (ii) denied in full the city's subsequent motion to hold Chestnut Hill in contempt of the preliminary injunction order, deeming the city's conduct to be unreasonable and potentially subject to Court sanctions.

11.     As to the latter, local press reported beforehand that "Corporation Counsel Barbara Graves Poller shared an application the city made on Monday, June 3, to Ulster Couty Supreme Court Judge Julian Schreibman to hold Chestnut Hill Inc. and its owner Joseph San Giovanni, who goes by Sangi, in civil contempt and to seek an injunction preventing him and Chestnut Hill Inc. from operating the boarding house."

12.      This lawsuit seeks to hold the City accountable for its discriminatory and retaliatory campaign, prevent further harm, and restore Chestnut Hill's rights to operate its facility for disabled residents. The facts below demonstrate a deliberate and sustained campaign by the City to discriminate against Chestnut Hill's disabled residents, deny them reasonable accommodations, and retaliate against their exercise of rights under the First Amendment, Fair Housing Act (FHA), and Americans with Disabilities Act (ADA).

13.     The two-time denial of special permit renewals, pretextual nuisance findings, and aggressive municipal actions, such as shutting off water for three months and conducting warrantless police raids, directly threatened the continued operation of Chestnut Hill and its ability to provide affordable and safe housing to the city's disabled population. The city's refusal to

accommodate reasonable accommodation requests, including waivers from excessive inspections and occupant registries that compromise privacy, further illustrates its intentional discrimination against Chestnut Hill and its residents. This pattern of discrimination is embedded in the City's Form-Based Zoning Code (Chapter 405), which unfairly targets disabled individuals by imposing housing restrictions not applied to similarly situated residents.

## PARTIES

14.    Chestnut Hill NY, Inc. is a New York corporation with a principal place of business located at 106 W. Chestnut Street, Kingston, County of Ulster, State of New York. Since 2014, Chestnut Hill has operated the 106 W. Chestnut Street property, itself a fourteen (14) bedroom 1860's-era converted mansion with an accessory cottage, as a congregate housing facility for the elderly and disabled.

15.    Chestnut Hill provides long-term, stable housing for individuals with disabilities, offering a crucial alternative to institutionalization or homelessness. At its peak in 2023, Chestnut Hill provided a safe space and sober living environment to as many as fifty-six clients living with a wide variety of disabling and limiting physical and/or mental ailments, including the terminally ill. It provides a supportive housing environment, encouraging and allowing each resident to live independently, as their individual capabilities will permit. The residents all shop for themselves (often together), cook for themselves (sometimes with assistance) and are responsible for cleaning, personal laundry, and all other daily life activities.

16.    The overwhelming majority of Chestnut Hill clients, including the individual Plaintiffs, meet the definition of "handicapped" under the FHA and are "disabled" within the meaning of the ADA. The group setting allows the residents to supplement one another's capabilities and work on social and other Activities of Daily Living (ADL) in a controlled, safe

environment. It is the place where they store their personal belongings safely and securely and where they call "home."

17.    The two-time denial of special permit renewals, pretextual nuisance findings, and aggressive municipal actions, such as shutting off water for three months and conducting warrantless police raids, directly threatened the continued operation of Chestnut Hill. The City's refusal to accommodate reasonable requests, including waivers from excessive inspections and occupant registries that compromise privacy, further illustrates its intentional discrimination against disabled residents.

18.    Jae Curtis is an individual and was a resident at Chestnut Hill from 2019 until 2024, when he was forced to leave the premises due to the emotional and physical trauma and stress caused by the city's aggressive attempts to shut down the 106 W. Chestnut location and forcibly remove him and other residents. Mr. Curtis currently resides in the state of Washington but was a New York resident at all times pertinent to this action, residing at 106 W. Chestnut Street, Kingston, County of Ulster, State of New York. Mr. Curtis has been diagnosed with bipolar disorder and schizophrenia and thrives in a congregate setting surrounded and supported by his peers and other individuals living with disabilities.

19.    Thomas Riker is an individual and was resident at the 106 W. Chestnut Street location, where he has resided for at least four (4) years. Mr. Riker has been diagnosed with severe depression but finds mental and physical comfort and support in Chestnut Hill's congregate living setting. He assists in the overall management and operation of the group facility and helps coordinate other residents in shopping, cooking, and cleaning, and in other Activities of Daily Living (ADL).

20.    John Sturm is an individual who resides at 106 W. Chestnut Street, where he has resided for at least five (5) years. Mr. Sturm lives with severe mental challenges that deprive him of the ability to read and write and to perform and in other Activities of Daily Living (ADL) without assistance and support, which he finds at Chestnut Hill.

21.    The individual Plaintiffs deem living in a congregate setting such as Chestnut Hill necessary for the maintenance of their health and well-being and have become accustomed to its semi-autonomous living arrangements and mutual support systems. All the individual Plaintiffs deem any alternative living arrangements offered to them by the Defendants to be substandard, transient, unreliable, and far below the living standard they have become accustomed to at Chestnut Hil.

22.    The City of Kingston, NY ("City"), is a municipal corporation of the state of New York with a principal place of business located at City Hall, 420 Broadway, Kingston, County of Ulster, State of New York. The City is governed by its mayor and chief executive officer and functions by and through a Common Council.

23.    The Zoning Board of Appeals is a duly constituted agency of the City with a principal place of business located at City Hall, 420 Broadway, Kingston, County of Ulster, State of New York, empowered to exercise the powers, duties, and functions of such zoning boards pursuant to N.Y. City Law § 81. The city mayor appoints the zoning board's members.

24.    The Planning Board is a duly constituted agency of the City with a principal place of business located at City Hall, 420 Broadway, Kingston, County of Ulster, State of New York, empowered to exercise the powers, duties, and functions of such planning boards pursuant to N.Y. City Law § 27. The city mayor appoints the planning board's members.

25.     Steven Noble is an individual who was at all pertinent times the mayor of the City of Kingston, NY, with a principal place of business located at City Hall, 420 Broadway, Kingston, County of Ulster, State of New York. In addition to being the chief executive officer of the city as municipal corporation, Noble personally directed, supervised, and participated in the civil rights deprivations referred to herein, and is therefore being sued in his official and individual capacity.

26.     Suzanne Cahill is an individual who was at all pertinent times the city planning director with a principal place of business located at City Hall, 420 Broadway, Kingston, County of Ulster, State of New York. Cahill directs, controls, and dictates the planning board agenda, process, and outcomes from her position as planning director, and personally directed, carried out, participated in, and otherwise encouraged the violations of civil and human rights of Plaintiffs, and is therefore being sued in her official and individual capacity.

27.     Suzanne Cahill is also the sister-in-law of Leo and Maureen Schupp – Ms. Schupp is the sister of Cahill's brother. On January 18, 2019, the Schupp couple both, overtly and through code words, publicly excoriated Chestnut Hill and its residents and otherwise pressured the city zoning and planning boards. Yet Cahill never publicly disclosed this relationship, much less recuse herself from the Chestnut Hill land use approval process. A true and correct copy of the Schupp's public statement is annexed hereto as **Exhibit 1**.

28.     Stephan Knox is an individual who was at all pertinent times the city code enforcement officer and/or building inspector with a principal place of business located at City Hall, 420 Broadway, Kingston, County of Ulster, State of New York, and personally directed, carried out, participated in, and otherwise encouraged the violations of civil and human rights of Plaintiffs, and is therefore being sued in his official and individual capacity.

29.    Bartek Starodaj is an individual and was at all pertinent times the city's Director of Housing Initiatives with a principal place of business located at City Hall, 420 Broadway, Kingston, County of Ulster, State of New York and personally directed, participated in, and otherwise encouraged the violations of civil and human rights of Plaintiffs. Starodaj was the "tip of the spear" in the city's efforts to invade Chestnut Hill and forcibly eject its residents, responsible for carrying out or participating in at least fifteen raids and other warrantless and illegal searches and seizures at Chestnut Hill and is therefore being sued in his official and individual capacity.

30.    Egidio Tinti is an individual who at all pertinent times was Chief of the city police department with a principal place of business located at 1 Garraghan Drive, Kingston, County of Ulster, State of New York and personally directed, carried out, participated in, and otherwise encouraged the violations of civil and human rights of Plaintiffs. Tinti directed, joined in, participated in, and otherwise personally encouraged numerous warrantless searches and seizures executed at Chestnut Hill, intimidate and coerced its residents, and otherwise misused the city's law enforcement apparatus to terrorize and forcibly evict disabled persons from Chestnut Hill, and is therefore being sued in his official and individual capacity.

31.    Eric J. VanAllen is an individual currently on administrative or other compelled leave as a present and/or former sergeant in the City of Kingston police department, with a principal place of business located at 1 Garraghan Drive, Kingston, County of Ulster, State of New York. VanAllen directed, joined in, participated in, and otherwise personally encouraged numerous warrantless searches and seizures executed at Chestnut Hill, intimidate and coerced its residents, and otherwise misused the city's law enforcement apparatus to terrorize and forcibly evict disabled persons from Chestnut Hill, and is therefore being sued in his official and individual capacity.

## JURISDICTION AND VENUE

32.    Pursuant to 28 U.S.C. § 1131, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

33.    This case arises, in part or in the alternative, from Defendants' profligate violations of Plaintiffs' rights protected by the United States Constitution.

34.    42 U.S.C. §§ 1983 and 1985 collectively provide a private federal cause of action for "deprivation of any rights, privileges, or immunities secured by" the United States Constitution and federal law, including by way of conspiracies to do so.

35.    This case arises, in part or in the alternative, from Defendants' profligate violations of Plaintiffs' rights protected by federal law.

36.    Noble, Cahill, Knox, Starodaj, Tinti, and Van Allen, each an employee, agent, or elected official, is a state-actor acting under color of state law for purposes of 42 U.S.C. § 1983

37.    Plaintiffs ask the Court to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), to the fullest extent permitted, over their state constitutional and statutory claims.

## STATEMENT OF THE CASE

**A.  Resolution of *Chestnut Hill I* Provides the Platform for More Discrimination**.

38.    Chestnut Hill acquired title to 106 W. Chestnut Street in 2017. By that time, the building and grounds had been in use for decades in various group living or care arrangements, including as a nursing home, and group living facility.

39.    On February 22, 2017, Chief Judge Brenda K. Sannes issued a temporary restraining order in *Chestnut Hill I*, restraining and enjoining the city from taking any further action to shut down Chestnut Hill and/or evict its residents during the pendency of Plaintiffs' action challenging the city's conduct to that point.

40.    The Court would need to continue the TRO eighteen (18) times after that.

41.    In the meantime, in settlement of *Chestnut Hill I*, the city required Chestnut Hill to pursue a use variance based on a finding that Chestnut Hill's congregate living facility qualified as a "Boardinghouse," which the City Code then in effect defined as "a private dwelling in which at least three [rooms] are offered for rent and table board is furnished only to roomers and in which no transients are accommodated. A rooming house or a furnished room houser shall be deemed a "boardinghouse."

42.    Chestnut Hill's facility was then in what was the city's "R-1" zoning district. Under the zoning code then in effect, a Boardinghouse was not allowed as of right in the R-1 zoning district. The city thus required Chestnut Hill to apply to the city zoning board of appeals for a "use variance" pursuant to N.Y. *Gen. City Law* § 81-B, *i.e.*, the authorization by the zoning board of appeals for the use of land for a purpose which is otherwise not allowed or is prohibited by the applicable zoning regulations. (*Id.*)

43.    Under the city code, upon a showing of "unnecessary hardship," the zoning board of appeals "shall grant the minimum variance that it shall deem necessary and adequate to address the unnecessary hardship proven by the applicant, and at the same time preserve and protect the character of the neighborhood and the health, safety and welfare of the community." (*Id.*)

44.    The city zoning board of appeals granted the use variance on October 19, 2018, by a 5-0 vote. The use variance states, in part: "The applicable zoning regulations and restrictions have caused an undue hardship on the property owner; that the property owner cannot realize a reasonable return in using the premises for any of the [*sic*] right uses set forth in an R-1 zone; that the hardship established to this Board is unique and not applicable to a substantial portion of the

neighborhood and that the hardship was not self-created." A true and correct copy of the October 19, 2018, use variance is annexed hereto as **Exhibit 2**.

45.    The use variance further stated, "Insofar as the current long-standing use as a boarding home has been established, the continued operation within the existing parameters cannot be considered as producing any undesirable change to the character of the neighborhood and granting the variance will not create any detriment."

46.    At that point, Chestnut Hill's right to operate the congregate group living arrangement became vested: from a land use and zoning perspective it had been granted a use variance and so was legally no different than any other use allowed in the R-1 district. It was no longer a nonconforming use, legal or otherwise. It was allowed in the R-1 district because it was no more intrusive than any allowed use in the R-1 district.

**B.  Unlawful Conditioning of Variance on Special Permit Acquisition**.

47.    With the *Chestnut Hill I* TRO still in effect, and in a Cahill and the zoning board of appeals implemented a discriminatory and unconstitutional plan to circumvent it: the city mayor and city planner Suzanne Cahill would also require the zoning board of appeals to impose (in addition to the use variance) a second required municipal approval – a special permit – from the city planning board, which Cahill leads and controls from her mayor-appointed position as city planner.

48.    After having obtained the use variance, at the commencement of the special permit process, on October 30, 2018, Chestnut Hill's legal counsel reported "if the Planning Board agrees to waive some elements of the boarding house requirements so that the facility now in operation may continue to function as financially viable entity, this action may actually be settled."

49.    This was Chestnut Hill's first request for reasonable accommodation under the ADA.

50.    In November 2018, during the special permit process, Chestnut Hill's counsel asked for a waiver or accommodation from the following special permit criteria contained in the existing law: (i) as to room and occupancy limitations, (ii) off-street parking restrictions, (iii) unconstrained facility inspections, and (iv) a certain locational minimum distance requirement.

51.    Chestnut Hill also sought a waiver from the requirement to keep a register of residents, arguing that the register requirement coupled with the unconstrained inspection requirement "denies these vulnerable residents their privacy and will discourage them from benefiting from applicant's housing." A true and correct copy of Chestnut Hill's November 28, 2018, request for accommodation is annexed hereto as **Exhibit 3**.

52.    This was Chestnut Hill's second request for reasonable accommodation under the ADA.

53.    The zoning board of appeals made no determination on the accommodation requests. Instead, it "granted a use variance to operate a boarding home *in accordance with the special permit provisions applicable in an R-2 zone*, on such terms and conditions as approved by the Planning Board," and "further granted a variance from such requirements set forth in section 405-12(B)(2) and section 405-12 as deemed appropriate by the Planning Board in its consideration and determination regarding the application for a special permit." (Emphasis supplied)

54.    Chestnut Hill was not then, and never has been, located in "an R-2 zone."

55.    Special permits are typically reserved for land uses that may be consistent with and are tantamount to allowed uses in the underlying zoning restrictions but pose potential impacts

different from or inconsistent with those of allowed uses, which can be mitigated to acceptable levels through land use conditions and other controls imposed on the use.

56.    The imposition of the special permit requirement as a condition of the use variance was a gratuitous power play by the city mayor and Cahill: Unlike a use variance, where the zoning board's powers to issue a use variance do not include the power to impose terms or conditions, the special permit process allows the municipality to weigh a proposed use in relation to neighboring uses and mitigate through terms and permit conditions any alleged adverse impacts that special use might bring. N.Y. *Gen. City Law* § 27-B.

57.    The zoning board of appeals bootstrapped the "special permit provisions applicable in an R-2 zone", to Chestnut Hill's land use located in the City's R-1 zone.

58.    Doing so was contradictory: the zoning board of appeals had ruled that a boardinghouse had existed on the site for "an extended period of time," and that Chestnut Hill's continuation of that congregate living arrangement would not cause any "undesirable change to the character of the neighborhood." But now, it was compelling another permit, ostensibly to ensure the same thing.

59.    This additional layer of scrutiny under the "special permit provisions" was a direct reaction to the disabled status of Chestnut Hill's residents, meant to target, regulate, and control the disabled residents of Chestnut Hill to a degree far different and far more stigmatizing then any non-disabled congregate living city resident.

60.    At the same time, the zoning board of appeals purported to "further grant[] a variance from such requirements set forth in section 405-12(B)(2) and section 405-12 as deemed appropriate by the Planning Board."

61.    The planning board was thus provided unbridled discretion to place conditions, or not, on Chestnut Hill's land use over and above those applicable in the R-1 zoning district, and could impose some, all, or none of the conditions "as deemed appropriate." This was all after or in addition to the zoning board's prior finding of overall compatibility of the use.

62.    The planning board would then impose special permit conditions that, as applied by the planning board and building department, would deprive Chestnut Hill of its vested right in the use variance – without the special permit allowing it, the use variance for congregate living has no value.

**C.  The Discriminatory Conditions in the 2019 Special Permit are Void.**

63.    The planning board recognized "[I]ncluded in the ZBA resolution was the stipulation that the boarding house fall under the requirements of the R-2 district but also included a waiver from the requirements in that section as deemed appropriate by the Planning Board. A true and correct copy of the minutes of the planning board's March 19, 2019, meeting on Chestnut Hill's special permit application is annexed hereto as **Exhibit 4**.

64.    The planning board then consulted a 1995 version of the City Code and the standards for a "Boardinghouse," thereunder.

65.    The planning board did not mention or refer to Chestnut Hill's request for accommodation and waiver and ultimately imposed conditions that had been the subject of those prior accommodation requests, and which would identify, regulate, and control the minutiae of Chestnut Hill resident life, and add an owner-occupancy requirement not otherwise contained in the zoning code.

66.    With respect to inspection of the property, the planning board decided "based on the inspections that have taken place over the years and the minimum square footage by NYS Building Code. Should not be imposed."

67.    The planning board also decided "Inspections are requested as part of the special permit process. This application will need to be renewed annually and with that renewal, the Building Department will be able to conduct an inspection."

68.    Unlawful discrimination is evident on the face of the final special permit issued on April 15, 2019, which purported to impose eighteen (18) separate conditions on Chestnut Hill's operations, none of which could have been imposed through the use variance alone, and none of which survive judicial scrutiny. A true and correct copy of the April 15, 2019, special permit is annexed hereto as **Exhibit 5**.

69.    Included among those are conditions, such as a registry requirement, which were the subject of Chestnut Hill's two (2) prior, but as yet unanswered, requests for reasonable accommodation under the ADA and FHA.

70.    Based solely on fear, animus towards the residents and discrimination, the planning board required that the owner live onsite 24/7 and "be a permanent resident of the City of Kingston," and sought through several other conditions to micromanage the way residents heat their rooms, what they eat (including where and when), how frequently they change their personal laundry and bedding, how often linens are changed or provided, and such things as the shape, placement and size of room numbering on doors.

71.    The planning board went as far as to overtly broadcast its intent to hide the group home and discriminate against its residents and viability by imposing a special permit condition:

"No sign shall be erected that identifies or advertises the use of the rooming house or boardinghouse for such purpose."

72.    With issuance of the special permit, the *Chestnut Hill I* TRO was finally released after 18 renewals and the *Chestnut Hill I* action discontinued in late 2019.

73.    The 2019 special permit contained no expiration date on its face, and the city zoning code does not impose any term. Nevertheless, Chestnut Hill would (at the instruction of Knox and Cahill) be required to apply for annual "renewal." For the years 2020, 2021, and 2022, that "renewal" process was routine and without incident- no new conditions were imposed on Chestnut Hill and few complaints raised as to its operations.

**D.  New Discrimination in Connection With the 2023 Renewal Request.**

74.    But 2022-2023 was different. In February 2023, defendant Knox issued a "Notice of Intent to Inspect." It stated, "Prior to this date, please advise your tenants of this inspection. If they will not be present, they should give you consent authorizing such inspection." A true and correct copy of the February 24, 2023, notification is annexed hereto as **Exhibit 6**.

75.    Knox thus knew by then, or should have known, that the building department and others required consent to enter the building.

76.    The same correspondence included a fee schedule, which stated, "*Owner occupied units are not subject to inspection or fee.*" Under condition one of the 2019 special permit "the owner thereof shall maintain his residence in and shall actually resides in said premises," which was the case at Chestnut Hill's group home. It was owner-occupied. The city would nevertheless impose on Chestnut Hill thousands of dollars in fines and penalties for allegedly failed or missed inspections.

77.     On April 17, 2023, defendant Knox reported favorably on the results of his various inspections to that date and stated: "I am willing to issue a 30–45-day operating permit at this point." A true and correct copy of the April 17, 2023, email exchange is annexed hereto as **Exhibit 7**.

78.     An hour later, Cahill, who is not the code enforcement officer, conducted no personal inspection of the facility, and had no way of knowing otherwise, e-mailed the planning board chair and an assistant corporation counsel stating, "I am of the opinion that we hold off. Items do not seem to be covered yet (can't confirm) and no time frame for removal. Also, other inspection needed."

79.     And hold off they did. All the while leaving Chestnut Hill and its disabled residents in limbo as to whether the residence that had been permitted and quietly enjoyed for years would continue to operate.

80.     On July 17, 2023, the city planning board adopted a resolution erroneously titled "Resolution of the City of Kingston Planning Board Renewing the Special Permit for #106 West Chestnut." It showed a motion by Wayne Platte, seconded by Matt Gilllis. A true and correct copy of the July 17, 2023, resolution is annexed hereto as **Exhibit 8**.

81.     But the title of the resolution is wrong; the planning board voted 4-1 "to withhold the renewal of a Site Plan/Special Permit for a Boarding Home located at 106 West Chestnut Street." The grounds for that declination are being litigated in *Chestnut Hill NY, Inc. v. City of Kingston*, Case No. 1:23-cv-010204-BKS-DKS (*Chestnut Hill II*).

82.     The next day, a local resident, Matt Colangelo, CPA, criticized the planning board's decision not to renew the permit: "This makes no sense to me other than to appease the neighbors."

He urged the city instead to "put the free [federal] money to work and pay for these repairs, make the property compliant, and keep the tenants housed."

### E.  The City Immediately Changes the Zoning Law.

83.     Within three (3) days of the planning board decision not to renew Chestnut Hill's special permit, on July 20, 2023, the city corporation counsel Barbara Jean Graves-Poller, Esq. insisted that the land use cease immediately and that the disabled persons living there be ejected. She began demanding confidential information about Chestnut Hill's residents and other private occupancy information – the same information Chestnut Hill had twice before made the subject of requests for accommodation under the ADA. She demanded the same again on August 18, 2023. A true and correct copy of the August 18, 2023, demand letter is annexed hereto as **Exhibit 9**.

84.     In the meantime, on August 1, 2023, the city common council had adopted an overhaul to the city zoning code, called a "Form Based Zoning Code." Under the Form Based Code, "Boardinghouses," "Emergency Shelters," and "Transitional Housing" are all singled out using length of residence to weed out and discriminate against disabled people by requiring a special permit for those uses in all zones, while not requiring a special permit for non-time-limited lodgings or hotels. The city has used time-limits of residency as a surrogate or code word for prohibited disability discrimination.

85.     Because Chestnut Hill was without the special permit at that time, the city deemed it to not have acquired any nonconforming use ("grandfathering") rights upon adoption of the Form Based Code. It erroneously characterized Chestnut Hill as a "Boardinghouse" under the Form Based Code. A true and correct copy of correspondence dated August 23, 2023, is annexed hereto as **Exhibit 10**.

**F.  Unconstitutional Retaliation Begins**.

86.    *Chestnut Hill II* was commenced in this Court on August 21, 2023. In a Memorandum-Decision and Order entered on July 15, 2024, this Court denied in part the city's motion to dismiss the complaint in *Chestnut II*.

87.    Chestnut Hill's legal counsel Barbara Jean Graves-Poller, Esq. was advised of *Chestnut Hill II*'s commencement as a courtesy on August 24, 2023. Because he was still prosecuting the special permit renewal before the planning board, Chestnut Hill's counsel concluded that correspondence with "Scheduling a meeting to discuss a reasonable accommodation that will allow the Boarding Home to continue to function" and "Reasonable accommodation meeting is still requested." A true and correct copy of counsel's August 25, 2023, request for accommodation meeting is annexed hereto as **Exhibit 11**.

88.    This was Chestnut Hill's *third* request for reasonable accommodation under the ADA, this time made directly to the city's chief legal officer. She would not reply to the request.

89.    Instead, on August 25, 2023, Barbara Jean Graves-Poller, Esq. chastised Chestnut Hill's counsel for allegedly improper service (which was not even attempted in the correspondence she references), and threatened to pursue sanctions against Chestnut Hill merely for exercising its First Amendment right to commence *Chestnut Hill II*: "I am sure you know that your email to Matt Jankowski does not constitute proper service under the [FRCP]; nor have you provided adequate notice of any plan to seek a temporary restraining order in a faraway courthouse." A true and correct copy of Graves-Poller's August 25, 2023, correspondence is annexed hereto as **Exhibit 12**.

90.    Showing the city's discriminatory intent, the August 25, 2023, correspondence deridingly referred to "a number of unnamed individuals with ***unspecified disabilitie*s** allegedly reside there." (Emphasis added). She ridiculed Chestnut Hill's then years-long efforts to provide

housing and care for disabled people. She concluded with a baseless demand for "a list of all current building occupants and confirm that your client will not allow additional persons to move into the building; and ii) state whether you will discontinue your client's patently meritless federal action."

91.     Again, the city was demanding, upon pain of penalty, the registry and other information that was the subject of three prior and as yet unanswered requests for reasonable accommodation, when it knew those requests had been made and had been unanswered.

92.     Defendant Noble continued to attack Chestnut Hill's residents and/or their disabilities. As local press reported, "Noble said the city has been provided with a copy of the lawsuit, which he said falsely alleges the city discriminated against tenants of the West Chestnut Street home "who suffer from *undisclosed disabilities*."" (Emphasis supplied)

93.     On August 30, 2023, Graves-Poller demanded that Chestnut Hill distribute a letter to its residents stating "the property owner's Special Permit for a Boarding House was denied on July 17, 2023 . . . based on failure to comply with the City's Administrative Code. Therefore, 106 West Chestnut Street . . . cannot lawfully operate as a boarding house. * * * All current residents must make arrangements to vacate this property before September 29, 2023." A true and correct copy of the August 30, 2023, letter and notice is annexed hereto as **Exhibit 13**.

94.     The notice revealed the city's intent to surveille the Chestnut Hill building: "WHILE THE CITY TAKES NECESSARY STEPS TO ENSURE PUBLIC SAFETY AND CODE COMPLIANCE, ALL REMAINING RESIDENTS MUST ENTER AND EXIT THIS BUILDING THROUGH THE FRONT DOOR," characterizing any other attempted entry as "PROHIBITED, UNSAFE, UNLAWFUL, AND DANGEROUS."

95.     While the city's lawyer was overtly threatening retaliation, Chestnut Hill continued in good faith to prosecute its re-application before the city planning board in the Fall of 2023, which was actively processing and meeting to discuss and consider the re-application.

96.     Between the Fall of 2023 and January of 2024, while Chestnut Hill was in the midst of a new application process, the city did everything in its power to empty the building forever.

**G.  Bogus or Non-Material Code Violations Begin to Accrue**.

97.     On September 1, 2023, the city issued a "Notice of Violations and Order to Remedy," citing three provisions of the newly adopted "Form Based Code." The city was operating on the assumption that Chestnut Hill, in operation at that location since 2017, continuing a group or nursing home living environment that had been present for decades before that, was not a legal prior nonconforming use vis-à-vis the 2024 code amendments as to any part of its historic or then current land use or operations, because it had withheld renewal of the special permit six weeks before.

98.     The city cited Chestnut Hill under the new code for operating the premises without the special permit the planning board had denied in July 2023, and which Chestnut Hill was still actively attempting to reinstate. It cited Chestnut Hill for not having an allegedly required license to operate.

99.     The city also cited Chestnut Hill for not providing the occupant register its counsel had thrice requested be waived as a reasonable accommodation. The same occupant registry the city's corporation counsel had aggressively demanded again two weeks before.

100.    Notwithstanding the prior requests for accommodation, the city again sought to compel disclosure of "the name of each guest spending the night or taking a room"; "The permanent residence and telephone number of each guest"; and "The hour of the day, month, and

year at which such guest arrived and departed from the premises in question and the number of the room assigned to each guest."

101.    None of the cited violations pertained to the exterior appearance of the building or the health, safety or welfare of its occupants or the public. The issue of the special use permit remained in flux, given that Chestnut Hill had again asked for an accommodation meeting and was actively working to cure the alleged deficiencies in the prior application.

102.    On September 6, 2023, the city found an alleged violation pertaining to the exterior appearance of the building. It claimed, *for the first time in the structure's 70-year history*, that the front steps lacked required handrails. It also claimed that the erection of two decorative exterior columns visible from the street since inception of construction required a building permit. A true and correct copy of the September 6, 2023, notice is annexed hereto as **Exhibit 14**.

103.    Two days later, Chestnut Hill's principal Joseph Sangiovanni refused consent to a warrantless inspection by defendant Knox and others. Again, Knox (and the city) knew, or should have known, that they required either consent or a warrant to enter the premises.

104.    By September 2023, local opponents to the group living arrangement were applauding the city's heavy-handed tactics. A resident named "Jan," referred to "***the sad situation at the boarding house***," which she called "***a terrible situation for anyone***," and "***especially sad for someone with mental health issues***." She indicated how she was "***forced to watch the sad parade of 'clients' who pace the street to avoid going into that fire trap***." She stated that the city's newly aggressive enforcement actions and displacement orders "***give me hope***." (Emphasis supplied)

105.    There were no fires, or fire-related safety violations at Chestnut Hill at that time. It was allegedly operating without a license, had not produced a registry, and constructed two

decorative exterior columns without a building permit. "Jan's" comments were motivated by nothing more than misinformation by the city and clear animus for the "***sad parade***" of disabled persons she was apparently forced to endure until the city took steps to forcefully evict them.

106.    Several members of the planning board at that time, and Cahill, were also the same as those who would have heard the discriminatory comments outlined in *Chestnut Hill II*.

### H. The Discriminatory and Retaliatory Public Nuisance Finding Issued While Chestnut Hill was Pursuing Renewal of the Special Permit.

107.    On November 1, 2023, the city converted the three (3) non-exterior and otherwise sought to be waived alleged violations, including two that were the subject of prior accommodation requests, into a "Notice of Violations Constituting a Public Nuisance and Order to Remedy." The alleged violations were (i) operating without the special permit (the one that had not been renewed and for which Chestnut Hill was still seeking renewal); (ii) not having an appropriate city license; and (iii) failure to provide the highly intrusive register of guest information and movements throughout the day. A true and correct copy of the November 1, 2023, Nuisance Notice is annexed hereto as **Exhibit 15**.

108.    At the same time, Chestnut Hill was prosecuting a new permit application, endeavoring to provide all the allegedly missing information the planning board had requested, while being harangued by the city's lawyers.

109.    This information was, as before, largely ministerial (*i.e.*, forms and certifications), or part of the "moving target" nature of the city's recent inspections, which were far more frequent and far more exacting and intrusive than any the city had ever before conducted at Chestnut Hill. A true and correct copy of the minutes of the December 18, 2023, planning board meeting are annexed hereto as **Exhibit 16**.

110.    Unlike every other public hearing or meeting on Chestnut Hill's application, and with arguments and subsequent findings made in *Chestnut Hill II* to the effect that the July 17, 2023, non-renewal was infected by discriminatory public comment, "No one spoke at the (July 2023) public hearing."

111.    Being intentionally disingenuous, the planning board Chair "asked the applicant to describe the application and what he is proposing to do." This was the same land use in place at that location for decades, and Sangiovanni was obviously well-known to the planning board.

### I.    Cahill Dominates the Public Meeting, Revealing Her Bias and Discrimination.

112.    Defendant Cahill took the lead in critiquing Chestnut Hill's resubmissions. She made a nonsensical statement of her lay interpretation of the variance granted by the zoning board of appeals in 2018. Counsel did not interject. She insisted that Chestnut Hill must be held to "***full compliance under the new code***." Counsel made a nonsensical statement. She particularly singled out Chestnut Hill's need for "***exceeding the number of rooms or the number of persons allowed in the [city] code***," matters for which she knew Chestnut Hill had requested reasonable accommodation or waiver as recently as August of 2023, as requiring yet another variance from the zoning board of appeals.

113.    Another planning board member stated that Chestnut Hill was limited to ten rooms and twelve tenants, maximum, when the building already had fourteen rooms in use for decades. Cahill again inquired into the number of tenants per room. Chestnut Hill had sought an accommodation of both standards in 2018 during the variance process and again in 2023 in the special permit process. Cahill never mentioned those requests.

114.    Chestnut Hill's counsel objected on the record to Cahill's misinterpretation of the variances and city code. Cahill then unilaterally delayed the meeting and tabled the application on

the pretextual grounds that Chestnut Hill had supplied its operations plan to the building department, and not the planning board, so it had to be resubmitted, and the meeting delayed when she had actual knowledge of and had reviewed the document already.

115. Cahill then began to attack the disabled residents personally, inquiring as to how many register, whether there is a check-in or check-out time, and the length of stay. Continuing to dominate the meeting, Cahill then began to query Chestnut Hill, which was before the board seeking a new operational permit, whether it had assisted with relocating its residents – the same residents Chestnut Hill was there to keep housed. In terms of fire code compliance, Cahill did not request any inspection or certification but instead demanded "a copy of the contract."

116. Cahill also stated that licensure, the very thing cited in the November 1, 2023, Nuisance Notice, "would happen after a special permit is issued and an operating permit is obtained." At the same time, Chestnut Hill was defending a nuisance action predicated on its not having a license or operating permit.

117. Delving even deeper, Cahill next asked for an interior pest management plan; inquired as to long-cured alleged violations related to an electric stove; inquired into the nature and frequency of internal house cleaning and demanded information on the provision of supplies and linens. Finally, she inquired into the names of the social services agencies who provide services to Chestnut Hill residents, who called them, and how frequently.

118. Planning Board member Grundig then "asked about documentation about police calls and fire calls since the last meeting," as if to suggest based on long-held stereotypes that they may be more frequent at Chestnut Hill merely because of its status as a congregate living facility.

119. The planning board voted to table the application and consider it again at its January 16, 2024, meeting.

120.    But in the meantime, while Chestnut Hill was in good faith pursuing renewal of the special permit, the mayor was working actively to close the facility forever.

**J.   The So-Called Findings of Fact Concerning a Public Nuisance.**

121.    On January 1, 2024, a panel of mayor appointed persons purported to issue "Findings of Fact and Recommendations" relative to the November 1, 2023, Nuisance Notice and resulting charge that Chestnut Hill and its disabled residents were all a public nuisance. A true and correct copy of the so-called Findings of Fact are annexed hereto as **Exhibit 17**.

122.    The "Findings of Fact" consisted of a pre-printed form with answers circled by the panel. This order purported to "direct[] payment of a fine of $250.00 for each day"; ordered compliance with laws generally; and under "Other," stated "Allow for an immediate fire & life & safety inspection."

123.    A little more than two weeks later, the planning board again denied Chestnut Hill's application to renew the special use permit. It did so in part as punishment or retaliation, characterizing Chestnut Hill's Fourth Amendment right to refuse consent to a warrantless administrative search an "intentional and blatant disregard" of city orders and "affirmative actions taken to prevent City Officials from conducting inspections." A true and correct copy of the January 17, 2024, denial is annexed hereto as **Exhibit 18**.

**K.   The City's Conscious Shocking Attempts to Displace the Disabled Residents by Force and Coercion.**

124.    Beginning on or about January 23, 2024, and again on January 29, 2024, the city erected a signpost on Chestnut Hill's private property stating:

**CLOSED BY**

**ADMINISTRATIVE ORDER**

By the City of Kingston

Premises MUST be vacated by 10AM on January 29th, 2024

Removal of this order is punishable by a Class A misdemeanor

A true and correct copy of the January 29, 2024, posted notice is annexed hereto as **Exhibit 19**.

125.    Shortly thereafter, the city entered a "Notice" in connection with the nuisance case adopting the "check-the-box" level Findings of Fact and imposing daily fines in the amount of $250.00/day, retroactive to July 18, 2023, and also demanding payment of $140,750.00 in allegedly accrued penalties. These fines and penalties have continued to accrue since that date. A true and correct copy of the February 4, 2025, notice is annexed hereto as **Exhibit 20**.

126.    The city also installed a surveillance camera directed at and filming Chestnut Hill's front door. It did so after already commanding the residents to enter and exist ONLY through the front door, *i.e.*, the door the city was now surveilling 24 hours per day, 7 days per week without consent or knowledge of the occupants.

**(1) *Warrantless Administrative Searches Begin*.**

127.    On January 29, 2024, city law enforcement agents, identifying themselves as such, entered the Chestnut Hill residence without consent or a warrant, shouting, in sum and substance, "You need to leave here immediately, or you will be arrested." This raid was led, directed, and orchestrated by defendant Starodaj Bartek, who at that time had recently been appointed by the city mayor.

128.    Bartek entered the private areas of the Chestnut Hill residence without consent or a warrant on January 29, 2024, January 30, 2024, and January 31, 2024, at times encouraging and

directing various social services personnel to join him inside the private residence and encourage residents to collect their personal belongings and leave immediately, upon pain of arrest or other forced removal.

129.    Bartek entered the private areas of the Chestnut Hill residence without consent or a warrant on February 2, 2024, February 6, 2024, February 8, 2024, and February 9, 2024, each time encouraging and directing various social services personnel to join him inside the private residence and/or encourage residents to collect their personal belongings and leave immediately, upon pain of arrest or other forced removal.

130.    Overall, Bartek made warrantless, nonconsensual entry to the interior private spaces of Chestnut Hill's group living facility at least eighteen times in a four-week period.

*(ii)    **Pre-Dawn Raids on Chestnut Hill by Armed Law Enforcement.***

131.    Early in the pre-dawn hours of March 5, 2024, six, armed and uniformed city law enforcement officers entered the private areas of the Chestnut Hill residence without consent or a warrant. This raid was led by a Sgt. Van Allen, who has since been placed on administrative leave for alleged misconduct. Bartek was present.

132.    Van Allen and other officers were aggressively banging on the (sometimes locked) private bedroom doors and threatening residents (including the individual Plaintiffs here) with immediate arrest and/or forced removal and relocation.

133.    On that date, one of the law enforcement agents produced a document titled "Notice to Vacate," which stated, "The Mayor has ORDERED that this building be Cleared Out and Boarded Up."

134.    The same set of events repeated itself again on March 14, 2024, March 22, 2024, and March 25, 2024. On March 26, 2024, two agents entered upon the property without consent

or a warrant and distributed additional copies of the "Notice of Violation" produced on March 5, 2024.

135.    In April 2024, the city's dislodgment practices became more aggressive. On April 10, 2024, an 80-year-old disabled resident using a wheelchair was informed that a police raid and his eviction or arrest were imminent. Under the duress of this notification, the resident suffered a heart attack and perished in Chestnut Hill's foyer before help could arrive.

136.    At approximately 5:00 a.m. on April 16, 2024, defendant Egidio Tinti, accompanied by at least ten (10) armed, uniformed city law enforcement officers, entered the private areas of the Chestnut Hill residence and ordered all residents and staff to gather in the foyer. A "Sgt. Negron" then stated, in sum and substance, "You knew this day was coming, we are here and we are not leaving until every one of you are out of this building."

### (iii) Fake Warrants and Eviction Documents Displayed by Tinti.

137.    Chief Tinti then notified plaintiff Riker that he possessed (and was also displaying) a document "Backed up by a Court judge" which Tinti affirmatively represented to plaintiff Riker to be an order authorizing his and others' forcible removal.

138.    The document Tinti displayed was in fact a document indicating that Chestnut Hill was operating the residence without the allegedly necessary special permit, given that the planning board had refused to renew it.

139.    This police raid on April 16. 2024, lasted for ten (10) hours, during which time law enforcement and city building and zoning officials (including defendant Bartek) entered locked rooms, threatened and harassed disabled and elderly and terminally ill residents, threatened them all with arrest or forced displacement, and some conducted an "inspection" of the residence.

140.    The alleged inspection on April 16, 2024, found a few fire extinguishers without tags and few loose wires. Nothing more, nothing less.

**L.  In a Show of Unprecedented Aggression, the City Disables Chestnut Hill's Private Water System and Confiscates its Water Supply Infrastructure.**

141.    Two days later, the city disconnected the running water serving the remaining residents, leaving them stranded without drinking water or water for basic life necessities commencing on April 18, 2024, and lasting three months.

142.    The ostensible reason given was an unpaid water bill in the sum of $7,200.00. There was no such bill; the city had already assessed $4,000.00 of that amount and imposed it as a lien on the real property, added to the annual tax assessment.

143.    The city did not just shut a valve supplying water to 106 W. Chestnut Street: the city mayor entered into a private agreement with another then present or former city water official, Carl Bell, authorizing that third-party to excavate the street and remove the "curb box," which is a box valve device owned by Chestnut Hill that generally demarcates the boundary between municipal water supply and its distribution via private pipes and lines.

144.    Upon information and belief, Noble and Carl Bell have a close personal relationship, whereby Bell has become a top vendor for a variety of no-bid city-funded projects.

145.    At Noble's personal direction, Bell excavated, disconnected, and removed this critical piece of water supply infrastructure, to scare, inconvenience, and otherwise leverage the removal of Chestnut Hill's elderly and disabled residents.

146.    At that time, Bell informed plaintiff Riker that he was acting at the direction of defendant Steven Noble and could not replace the curb box (and/or its replacement) without Noble's permission.

147.    Chestnut Hill's principal, Joeseph Sangiovanni, then spoke to Kevin Gray, whom he understood to be an official within the city water department. In sum and substance, Gray stated, "We had nothing to do with removing your curb box . . . The Water Department refused to do any of it. The mayor took it upon himself and hired an outside contractor to do this to you."

148.    Sangiovanni then contacted Matthew Dysard, whom he understood to be director of the city water department. Dysard then related he his department "had nothing to do with" the excavation or removal of the curb box. He added, "the mayor ordered me to do this to you and I refused." He reported that the mayor had hired the third-party contractor to do the work when his department had refused to do so.

149.    The city water supply to the Chestnut Hill residence would remain shut-off for the next three months, throughout the spring and into July of 2024. For the entirety of that time, the elderly and disabled residents had no heat, no running water in taps or showers, no on-site laundry facilities, no water for washing dishes or cleaning floors and surfaces, and were forced to use outside, temporary sanitary facilities such as those typically found on construction sites.

150.    At that time, NYS Supreme Court, Ulster County (Hon. Julian D. Schreibman), ordered the city to restore the water supply within 72 hours of his Order. A true and correct copy of the transcript of the July 8, 2024, hearing before Justice Schreibman is annexed hereto as **Exhibit 21**.

151.    The city then delayed another two (2) weeks before permitting Chestnut Hill to replace the water supply and only did so upon further directive from Justice Schreibman. A true and correct copy of the contract and building permit for the restoration is annexed hereto as **Exhibit 22**.

**M. Bogus and Non-Existent Violations Continued to be Noted and Levied**.

152.    While the Chestnut Hill residence was without water, the city continued to levy fines and other violations against it for alleged building and zoning code violations. On October 28, 2024, a consented to facility inspection was conducted with Chestnut Hill's legal counsel in attendance during which time no violations were identified.

153.    But by November 6, 2024, defendant Stephan Knox had concocted another set of violations. This time, Knox complained about certain obscure fittings in Chestnut Hill waste disposal (sewage) line, which had never before been identified, much less failed or manifested in any leaks or performance issues.

154.    On November 11, 2024, Knox sent another notice to remedy, this time relying on outdated photographs to accuse Chestnut Hill of mismanaging its solid waste. This accusation was false.

155.    On November 13, 2024, Knox sent a redundant and unwarranted notice to remedy, pertaining to the matters that had been cured before the October 28, 2024, inspection.

156.    On December 20, 2024, Knox sent another notice to remedy, this time based upon an inspection that had never occurred.

157.    The same thing happened again on January 8, 2025. On January 9, 2025, Knox assessed a $3,000 fee against Chestnut Hill to pay for his building and code inspections, some of which had never occurred. On January 14, 2025, and January 28, 2025, after another set of phantom inspections, Knox again assessed fines and fees.

158.    All the conduct and actions alleged herein as to any individual or entity and/or in the exhibits to this Complaint were taken by New York State and City of Kingston officials and/or their agents acting under color of state law.

159.    Given that the city has discriminated against Chestnut Hill since at least 2018, and in 2024 adopted a facially discriminatory zoning amendment, it has engaged in a policy, practice, and custom of violating the civil rights of these Plaintiffs and the broader population.

**COUNT I**
**(Intentional Housing Discrimination Under the FHA – Special Permit Conditions)**

160.    Plaintiffs repeat and reallege all the above allegations as if set forth in full herein.

161.    42 U.S.C. § 3604(f) makes it unlawful "[T]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of" a class of persons including the Plaintiffs herein as (i) renters, (ii) persons intending to reside at Chestnut Hill, and (iii) persons associated and affiliated with the foregoing. The phrase "otherwise make unavailable," includes discriminatory zoning restrictions and land use practices. *MHANY Mgmt., Inc. v. New York Communities for Change, Inc.*, 819 F.3d 581 (2d Cir. 2016).

162.    42 U.S.C. § 3604(f)(1) and (f)(2) prohibit local governments from applying land use regulations in a manner that will exclude people with disabilities from residential neighborhoods or that will give disabled persons less opportunity to live in certain neighborhoods than people without disabilities.

163.    The history and sequence of events reveal that by imposing the requirement to obtain a special permit when none was required in the R-1 zoning district by the text of the city zoning code, Cahill directly, and the zoning board of appeals indirectly, intentionally imposed an unreasonable, unique, onerous requirement on Chestnut Hill's operations, then cited Chestnut Hill and otherwise imposed punishment for pretextual violations of the special permit conditions as the means of forcing the discontinuance of operations and eviction of its residents.

164.    As evidenced by the unlimited discretion the zoning board purported to grant to the planning board, and by the public minutes and communications, requiring a special permit and

granting such discretion departed from normal and typical procedures relative to use variances granted in the city's R-1 zoning district.

165.    The planning board did not judge the special permit by the substantive criteria in the city code, but instead freelanced, and imposed additional discriminatory conditions on the land use.

166.    The imposition of the special permit requirement served no legitimate, bona fide, governmental interest, and even if it did, there were less stringent alternatives to adding an unwarranted layer of administrative approval and regulation not imposed on other group residences.

167.    The conditions the planning board and Cahill imposed are unlawful under the FHA. For example, a 24/7 live-in site manager imposes a significant monetary cost on Chestnut Hill's operations. If that cost is passed on to residents, that would deter them from banding together in a supportive manner to further their coping skills and/or recovery.

168.    The 24/7 requirement is also contrary to Chestnut Hill's goal of promoting independent living for disabled persons. The presence of a full-time authority figure can frustrate the privacy and autonomy of these individuals and their ability to achieve an independent and normal living setting.

169.    Nor do Chestnut Hill's elderly and disabled residents who wish to live in a group home setting to aid in their recovery pose any greater public safety risk or potential for generating excess debris or overcrowding than any other group of non-disabled individuals who wish to live together. The expense of complying with needless safety requirements also amounts to an onerous burden which has the effect of limiting the ability of disabled persons to live in the residence of their choice.

170.     Beyond the above, there is no legitimate governmental interest in regulating how often the laundry is done at Chestnut Hill and/or by whom, how clean the kitchen sink is, who eats snacks in their bedroom, or how frequently the trash can is emptied, yet that is the level of attempted micromanagement contained in the 2019 special permit.

171.     Once the 2019 special permit conditions are declared void under the FHA, the Court should further declare that any and all alleged violations of those conditions, including those later used to leverage liens, fines, the nuisance finding, and warrantless searches, are void, unenforceable, and lack any force or effect.

## COUNT II
**(FHA Discrimination – Nuisance Finding and Second Special Permit Denial)**

172.     Plaintiffs repeat and reallege all the above allegations as if set forth in full herein.

173.     The second special permit denial of was affected by direct animus against Chestnut Hill's operations on behalf of disabled persons and out of a personal distaste for people with disabilities living in residential areas, exactly as it was in *Chestnut I*.

174.     The nuisance finding was affected by direct animus against Chestnut Hill's operations on behalf of disabled persons and out of a personal distaste for people with disabilities living in residential areas.

175.     Alleged statements of concern for Chestnut Hill's "poor" residents or "those people" merely masked the discriminatory assumption that those residents were somehow involuntary or trapped into some assumed living condition, when in fact Defendants know, or should have known, that Chestnut Hill provides a permanent abode for many residents, some for decades. Plaintiffs Curtis and Riker have lived there for 4 and 5 years, respectively.

176.     As reported in the local press, ""Ten bedrooms, 12 people max," Platte said. "That's going to be our position.""

177.    The above is all evidenced by the public comments cited in *Chestnut Hill II*, as well as those of Shupp, David K. Gordon, "Jan," Donna Grover, and those of the city's corporation counsel Barbara Jean Graves-Poller and its city planner Suzanne Cahill.

178.    As if referring to hunted animals, not human beings, local press reported "Tinti said three residents decided to leave that day, but others chose to remain "hunkered down.""

179.    The city's corporation counsel and mayor both maliciously parroted the line about "undisclosed disabilities," when Chestnut Hill was under no obligation or compulsion ever to "disclose" such things. The obvious implication was to denigrate the veracity or credibility of Chestnut Hill's residents.

180.    The above policies have also had a disparate effect on Chestnut Hill, as other, similarly situated land uses, even those with expired special permits and outdated inspections, were consistently being allowed by the planning board at or around the same time it was refusing to process, then denying Chestnut Hill's substantially similar application.

181.    On December 18, 2023, the planning board stated on another application (44 Maiden Lane; a boardinghouse/B&B)) that, "There is no requirement to issue a term for special permits." Chestnut Hill's 2019 permit did not include a term. Yet Chestnut Hill was required to "renew" its termless permit annually.

182.    As to the operations plan, while Chestnut Hill was seeking to reinstate the special permit and Cahill was quibbling with it over the details of the operations plan as late as January 2024, the planning board had just two months before approved another Boardinghouse land use at 356 Broadway, allowing those applications to defer filing of the operations plan until after the special permit issued. After approving the special permit, the planning board stated that the operations plan could "be submitted to staff for review and approval."

183.    At the same October 2023, meeting, the planning board was considering another Boardinghouse use that contemplated housing for disabled individuals and others requiring support and care. It added to the record lengthy correspondence from a "Sara Wenk, 150 Main Street," in which Ms. Wenk, apparently suffering under various stereotypes about disabled individuals more generally, told the planning board and Cahill of her "major concern . . . about the quality of life being offered," given the "very, very small living spaces," that "looks more like warehousing than real housing." She indicated that "Neighbors are also curious about the track record of [applicant], in developing, managing, and maintaining a *property like this*, or other properties in general." (Emphasis supplied)

184.    She continued, "we have concerns about nights and weekends and what kind of oversight can be made available," and "there is also no information provided about the targeted population . . . which we would like to better understand.

185.    Sank continued her assault on the integrity of disabled persons: "***We have concerns about who will be living on the property and how they will be vetted and chosen for residence, if indeed there is going to be a vetting process***." (Emphasis supplied).

186.    She demanded "a clear understanding of the resident population" and insisted that "the rules for acceptable conduct is, obviously, essential."

187.    Another resident, Felipa Gaudet, 127 Pearl Street, than "Agreed mostly with statement made by S. Wenk." She added that the "number of people is unsettling," and also wanted to know about the "target population."

188.    The special permit in that case was also already expired, and work performed without a building permit, yet that facility seems not to have suffered any consequences, unlike Chestnut Hill:

> "The project also involves a special permit. The original special permit at this location expired. Renovation of the rear building was done without an active special permit. With the application for the front building before the Board for site plan review and an increase of intensity of the site, the special permit will also be considered. Boarding houses are allowed in this zone with a limit of 10 rooms and a maximum of 12 residents. The Boarding house at this location has only 10 rooms and is used as single room occupancy. An operations plan was submitted by the owners and Family of Woodstock. The building has a shared kitchen and also shared bathrooms. At present it is fully occupied and has an operating permit to expire on 3/30/25. This plan will need to be reviewed and approved by the Board as part of any decision.

189.    Some similarly situated land uses before the planning board in late-2023, such as #79-83 Green Street, did not require a special permit at all:

> Staff advised the Board that the Planning Office has been meeting with the BSD, Corp. Counsel and Housing Initiatives Office to establish a process to undertake the review, given the number of unknowns in the records. For example, a portion of the structure is operating as a Boardinghouse use, yet there has never been a special use permit review or issuance by the city. Building inspections have taken place over the years, but not with a consistency that would allow for definitive framing of progression in the development of the current layout. Without any record of the conditions within the building, the owner was directed to submit floor plans showing the layout and rental makeup as the property currently exists. In reviewing these floor plans it was noted that the units are a mix of apartments with kitchens and bathrooms and other units that do not have either kitchens or bathrooms or both. There are some shared bathrooms that can be used by tenants without those services in their units/rooms, however, there is no shared kitchen for the units/rooms which do not have any. There are washer/fryer units (laundry area) in the basement, however, staff was advised these are non-functional.

190.    Defendants' conduct in treating Chestnut Hill differently and denying the second special permit application based on intentional discrimination and/or based on the discriminatory and disparate application of planning board rules should accordingly be declared in violation of the FHA and ADA.

## COUNT III
### (Refusal to Grant Reasonable Accommodation)

191.    Plaintiffs repeat and reallege all the above allegations as if set forth in full herein.

192.    Title II of the ADA requires public entities to "make reasonable modifications in policies, practices, or procedures when those modifications are necessary to avoid discrimination based on disability." 28 C.F.R. 35.130(b)(7). The FHA contains similar requirements.

193.    The vast majority of Chestnut Hill residents, including Plaintiffs Curtis and Riker, are "handicapped" within the meaning of the FHA and "disabled" under the ADA: they live with and may be recognized as having physical and/or mental or psychological limitations that, if not accommodated, interfere with Activities of Daily Life (ADL) and prevent them from integrating into non-institutional settings and residential areas.

194.    In this case, Defendants failed even to address, much less decide upon, Plaintiffs' no less than three requests for reasonable accommodation as to the registry, room capacity, inspection, and other requirements. And when the ADA-required accommodation was not forthcoming, Defendants then used the alleged violation of those not accommodated regulatory requirements (such as the failure to produce a registry, or excess room occupancy) to effectively bury Chestnut Hill in unconstitutional fines and penalties, and ultimately the forced displacement by violence, intimidation, and coercion, of Chestnut Hill's elderly and disabled population.

195.    Chestnut Hill justified the need for the accommodations as to room occupancy by pointing to the mutual support ethos of the group environment.

196.    Chestnut Hill sought accommodation on the draconian inspection and record-keeping requirements, arguing how such intrusive and invasive oversight and supervision was anathema to the rehabilitation and independent living goals of its residents.

197.    Chestnut Hill explained on multiple occasions that requiring such parochial registry instilled fear and distrust in and would deter his residents from recovery, integration, and taking refuge at Chestnut Hill, some choosing instead to become unhoused, and that the registry requirement presents a real and material barrier to the ability of people with disabilities to engage in normal daily activities, presents a barrier to recovery, and can intimidate and lessen the availability of group housing like Chestnut Hill.

198.    Defendants, by failing to act on and/or denying Chestnut Hill's multiple requests for accommodation violated the FHA and ADA reasonable accommodation requirements.

## COUNT IV
### (First Amendment, FHA, and ADA Retaliation – Post-*Chestnut II*)

199.    Plaintiffs repeat and reallege all the above allegations as if set forth in full herein.

200.    The First Amendment to the United States Constitution protects fundamental freedoms, including religion, speech, the press, assembly, and the right to petition the government for redress of grievances. It prohibits governments from retaliating against citizens who exercise any of the above rights. In this case, Defendants reacted immediately and viscerally to Plaintiffs' commencement of litigation challenging municipal actions. That retaliation took the form of overly aggressive and unconstitutional warrantless searches and seizures, and the routine and regular berating of, chastising, instilling fear of arrest into, and attempting to dislodge by force and false charges, Chestnut Hill, and its disabled residents.

201.    The FHA makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the FHA]," 42 U.S.C. § 3617, including against any person that has made a complaint, testified, assisted, or participated in any manner in a proceeding.

202.    The Americans With Disabilities Act ("ADA") includes similar prohibitions: it is "unlawful to coerce, intimidate, threaten, or interfere with any individua in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Chapter." . 42 U.S.C. § 12203(a); 29 U.S.C. § 791(g).

203.    Prohibited retaliation means: (a) that the Plaintiffs engaged in activity protected by the FHA; (b) that the Plaintiffs were engaged in, aided (or encouraged others) to exercise or otherwise enjoy their FHA-protected rights; (3) the Defendants coerced, threatened, intimidated, or interfered on behalf of the statutorily protected activities; and (d) the defendant was motivated by an intent to discriminate. As delineated more fully below, Defendants' conduct here fits this standard.

204.    Protected activity includes "opposition to any act or practice made unlawful" by applicable anti-discrimination statutes. 42 U.S.C. § 12203(a).

205.    Chestnut Hill engaged in protected activity by commencing *Chestnut Hill I* and *Chestnut Hill II*, and by speaking out in public hearings, to the press, and elsewhere against Defendants' refusal to accommodate their disabilities, and other heavy-handed and unreasonable dislodgment tactics, including withholding renewal of the special permit twice.

206.    From July 18, 2023, until August 24, 2023, Chestnut Hill was working diligently with the planning board and exchanging information in a good faith attempt to reinstate the special permit, and the city was in part reciprocating those efforts.

207.    Almost immediately upon filing *Chestnut Hill II*, the city became more aggressive in is attempts to shut Chestnut Hill's facility and evict its residents. This is evidenced in part by the threats made by the city corporation counsel in August 2023, upon learning that *Chestnut Hill*

*II* had been commenced, and through Cahill's overt hostility and discriminatory focus at the December 18, 2023, public hearing, which merely continued her earlier bias against Chestnut Hill, as exemplified by her overriding the building inspector's opinion that the Chestnut Hill was rendered safe and could be permitted to operate.

208.    The planning board cited Chestnut Hill's refusal to consent to a warrantless search as grounds for denying the renewal permit in 2023. As reported by local press, "Platte also cited building inspectors being denied access to the property in September and October in the board's decision to deny the special use permit."

209.    As reported in local press, "Just before the board's vote, Platte said that "the blatant disregard of a special use permit and the actions taken during inspections is a danger to residents of the property and the residents of the city of Kingston.""

210.    Chestnut Hill has a fundamental right to refuse consent to warrantless searches of its premises.

211.    Retaliation is further evidenced by the public nuisance proceeding and findings process, which declared Chestnut Hill a public nuisance for alleged failure to possess the registry it had earlier resisted and based on other interior or paperwork violations having nothing to do with the public health, welfare, or safety or the safety of Chestnut Hill residents.

212.    It is finally evidenced by the inordinate amount of unusually intrusive inspections, searches, reports, and studies of and at Chestnut Hill, which distinguishes it from any other multi-family arrangement in the city.

### COUNT V
### (First Amendment: Prohibited Content-Based Regulation of Speech)

213.    Plaintiffs repeat and reallege all the above allegations as if set forth in full herein.

214.    The First Amendment generally prohibits municipal officials from regulating the content of speech on matters of public interest and concern.

215.    The availability of integrated group living arrangements is a matter of abiding public interest and control, and one of the overall goals and policies of the FHA.

216.    Among the conditions imposed on Chestnut Hill was that "No sign shall be erected hat identifies or advertises the use of the rooming house or boardinghouse for such purpose."

217.    The condition regulates the content of speech, *i.e.*, the use of a boardinghouse may not be advertised, but any other residential use, including "the Home of the Smith Family," or even "Home of the Smith and Jones Families," is not so regulated. If the city wishes to prohibit self-referential signage at residential properties, it may impose an across-the-board ban on such signs; it may not single out and ban speech about providing housing to the unhoused and/or disabled, or publicizing the presence of disabled persons in a residential district. Nor can it impose civil fines and penalties for violations of that unconstitutional requirement.

218.    Chestnut Hill, would, but for the ban on signage, want as many people as possible to know that it provides assistance, support, and housing to disabled individuals, the elderly, and/or the unhoused, in the light of the reality that those categories often overlap.

219.    The city seeks to bring civil charges against Chestnut Hill based on its exercise of free speech rights as to the availability of lodging for people with disabilities.

220.    There is no legitimate governmental justification for this differential treatment of speech related to the availability of housing for people with disabilities and any other sign or notification that is unregulated.

## COUNT VI
### (Fourth Amendment – Unreasonable Search and Seizure)

221.    Plaintiffs repeat and reallege all the above allegations as if set forth in full herein.

222.    The Fourth Amendment to the United States Constitution secures to citizens, including these Plaintiffs, the right to be free from "unreasonable searches and seizures," and requires that "no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized."

223.    This constitutional right to be free from unreasonable searches and seizures extends to Chestnut Hill and its residents, and prohibits warrantless administrative searches, except in narrow circumstances that are not present here.

224.    The City of Kingston code provisions authorizing administrative (i.e., building and zoning compliance) searches, Chapter 172 of the City Code, are unconstitutional on its face and as applied because it fails to provide sufficiently detailed standards governing any such searches.

225.    The city code authorizes inspections upon "(2) receipt by the Code Enforcement Officer of a written statement alleging that conditions or activities failing to comply with the Uniform Code or Energy Code exist; or (3) receipt by the [CEO] of any other information, reasonably believed by the [CEO] to be reliable, giving rise to reasonable cause to believe that conditions or activities failing to comply with the Uniform Code or Energy Code exist." (*Id.*)

226.    The same section of the city code stated, "nothing in this subdivision shall be construed as permitting an inspection under any circumstances under which a court order or warrant permitting such inspection is required unless such court order or warrant shall have been obtained."

227.    The code provides no other guidance or standards for measuring, before the search or inspection, when "a court order or warrant permitting such inspection is required."

46

228.    In this case, Tinti lied to the residents during the March raids, waving a sheet of paper he claimed was somehow judicially endorsed and authorized his search. The sheet of paper was neither a warrant nor any judicially approved search or eviction order.

229.    Multiple dwellings (such as Chestnut Hill) that are not places of public assembly or schools or colleges require inspection "at least once every 36 months." City Code 172-12(A)(3).

230.    When the city planning board deliberated on the 2019 special permit, it acknowledged that Chestnut Hill should be inspected once annually, upon renewal of the permit.

231.    On each of the dates stated above, some combination of Starodaj, Knox, Tinti, Van Allen, and police or law enforcement or other agents of the foregoing, including those named Burkert, Lowe, Aitken, Solian, Saracino, Studt, Wagner, and Kight, often accompanied by complete strangers, entered the private, not publicly observable areas of Chestnut Hill without consent or a warrant authorizing such entry.

232.    During one warrantless entry, Tinti detained plaintiff Riker and interrogated him as to the location of certain relief supplies. Tinti then took that information and reported it to the press: "Tinti said after questioning the property manager, Thomas Reiker, they found that duffle bags provided by the Department of Social Services to help residents move to new housing placements were stowed away in a basement. Authorities then brought them outside for the tenants to use, he said."

233.    There was neither a reasonable suspicion nor probable cause to support any of these warrantless entries.

234.    Any ostensible consent given was affected by coercion, *i.e.*, multiple city law enforcement officers shouting in the newly awakened disabled residents' faces between 5:00 a.m. and 7:00 a.m., then occupying Chestnut Hill for ten hours, demanding access to interior locked

spaces, and interrogating clients on their disabilities and intentions upon threat of violence and/or arrest and/or immediate eviction.

235.    The scene during these warrantless searches was made even more stressful and chaotic by the large numbers of officers and agents to attend each one, ranging from 6-20 at any given time, many of whom threatened to deposit the residents' belongings on the street if they refused to comply with the order to remove themselves.

236.    Each one of these searches caused residents to feel extreme fear for their personal well-being, safety, and security, both in the immediate and long-term, as they faced the prospect of being forcibly removed to substandard city shelters, warming centers, or other transient, temporary arrangements which offered them none of the protections afforded at Chestnut Hill, or of being completely unhoused.

237.    The city's conduct in sponsoring, and that of Tinti, Knox, Starodaj and others in conducting these warrantless inspections violate the Fourth Amendment.

238.    The city attempted to bill Chestnut Hill for the wages and overtime paid to each of eleven (11) different police officers in carrying out the above warrantless raids, then taxed that amount against the parcel when Chestnut Hill refused to pay it.

## COUNT VII
### (Denial of Substantive and Procedural Due Process –
### Water Supply Shut Off/Harassment of Residents)

239.    Plaintiffs repeat and reallege all the above allegations as if set forth in full herein.

240.    The Fourteenth Amendment both secures to all citizens their "privileges and immunities," and prohibits governmental deprivations of "life, liberty, or property, without due process of law" and the governmental denial to any person of "the equal protection of the laws." (*See also* U.S. Const. Amend. V)

241.    The city has enacted or adopted, and maintains certain written rules, regulations, and procedures which govern the supply of city water to various parcels located in the city. Pursuant to these rules, the most stringent regulatory penalty for nonpayment is the imposition of a lien on the real property equal to the sum of the unpaid water bill (plus any applicable penalties).

242.    Chestnut Hill and its residents have a right to the free flow of running water to the West Chestnut Street group living facility, and Chestnut Hill holds title to the removed curb box – it is not city property.

243.    No part of the city's water rules even contemplates, much less authorize, the removal of private curb boxes as a means of enforcing unpaid water assessments by disabling the water supply entirely.

244.    Upon information and belief, the city has never, at least in the past 50 years, removed a curb box or similar device as a means of enforcing unpaid water assessments by disabling the water supply entirely.

245.    Chestnut Hill and its residents have a property right and a basic human right to running water and interior plumbing and could not be deprived thereof without due process of law; at a minimum, compliance with the city mandated procedures.

246.    The mayor's directive to Bell to remove the curb box had nothing to do with unpaid water assessments, or legitimate governmental efforts to collect them, and served no other legitimate governmental interest. It was instead meant to and did deprive the residents of an essential life necessity – water – for more than three months in order to leverage the city's broader and impermissibly discriminatory goal of dislodging them from the Chestnut Hill residence and shutting it down for the last time.

247.    Within two days of disconnecting the water, the city stormed the building in the pre-dawn hours without prior notice or warrants, as if executing a dangerous search or arrest warrant raid, when no such show of force was required or allowed. By this point, the residents were already traumatized by and still adjusting to the lack of running water, and found themselves being harried, shouted down, physically directed, detained and managed, and ordered to open interior locked rooms and offices by armed police officers and city officials swarming the interior spaces of the building.

248.    This terroristic activity lasted for 10 hours.

249.    Their targets were not dangerous criminals, but instead the small group of elderly and disabled residents at Chestnut Hill, who suffered extreme fear, intimidation, and severe mental distress because of the city's conscious shocking tactics targeting Chestnut Hill's disabled population.

## COUNT VIII
### (14TH Amendment – Denial of Due Process of Law)

250.    Plaintiffs repeat and reallege all the above allegations as if set forth in full herein.

251.    Chestnut Hill and its residents have a right to the free flow of running water to the West Chestnut Street group living facility, and Chestnut Hill holds title to the removed curb box – it is not city property.

252.    The city has regulations in place and an established process and rules for handling delinquencies or arrears in municipal water charges.

253.    The process under city law is that the arrearage, if unpaid, becomes a lien on and is added to the annual tax bill, to be paid in addition to the typical real property and school taxes that annually accrue.

254.    In prior years, the city had done just that with respect to Chestnut Hill; any arrearage was merely added to the periodic tax bills – no judgments were entered, no liens filed.

255.    Neither city nor New York State law authorizes, or even contemplates, the forced disconnection of a fully occupied residential parcel from a municipal water supply based on alleged arrears in water rents.

256.    Chestnut Hill was at all times the owner of the curb box installed underground.

257.    Without notice, or any opportunity to be heard, the city removed the curb box without Chestnut Hill's permission, then delayed, obfuscated, and disassembled for months until NYS Supreme Court ordered that the system be reconnected.

258.    Upon information and belief, defendant Noble, in connection with a third-party named Carl Bell, implemented the plan to remove Chestnut Hill's curb box outside the normal course of business, by offering Bell a no-bid contract for his private plumbing company to affect the removal, which he did.

259.    Defendant Noble's plan and scheme to dislodge Chestnut Hill and its disabled residents was so extreme and extraordinary that city employees refused to carry it out in the normal course of their duties and decried him for doing so, knowing the devastating effect it would have on people with disabilities.

260.    Nevertheless, without any due process and without any compensation, the city removed the curb box and deprived Chestnut Hill's disabled residents of their fundamental right to running water, and Chestnut Hill's property right in the curb box, for nearly three months.

**COUNT IX**
**(Prohibited Housing Discrimination under the FHA – City Code Ch. 405-2 and 405-21E)**

261.    Plaintiffs repeat and reallege all the above allegations as if set forth in full herein.

51

262. The FHA prohibits enforcement of rules and regulations that are facially neutral but have disproportion effect on a protected class, such as disabled persons.

263. Chapter 405 of the city code ("Zoning") singles out group family housing for discriminatory treatment and draws unreasonable and unconstitutional distinctions among like land uses based solely on the characteristics of the residents, including disabilities.

264. Under the city code, "Lodgings" and "Residential Care Facilities" are permitted as of right in the same zoning district as Chestnut Hill.

265. A "Boardinghouse," or "Emergency Shelter," or "Transitory Housing" land use is only permitted with a special permit in nearly all districts – they are permitted as of right in no city zoning districts at all.

> BOARDINGHOUSE
> A BUILDING where 10 or fewer sleeping rooms without separate kitchen facilities are used by transient, nonpermanent lodgers for compensation. Rooms in a BOARDINGHOUSE are intended to be occupied by individuals who may share common areas and facilities, but do not form a single housekeeping unit, and do not provide compensation under a single lease. If there are more than 10 sleeping rooms, such building shall be considered a hotel.
>
> EMERGENCY SHELTER
> A facility whose primary purpose is to provide a temporary shelter for unhoused populations in general, or for specific populations of the unhoused, and which does not require occupants to sign leases or occupancy agreements. Emergency shelters may include day and warming centers that do not provide overnight housing.
>
> TRANSITIONAL HOUSING
> A facility providing short-term housing, typically for less than 24 months, and appropriate supportive services to those in need to facilitate movement to independent living.

266. The emphasis in these definitions on "transien[ce]," "temporary shelter," and "short-term housing," each are code words for the living arrangements of people with disabilities and the unhoused.

267.    There is no legitimate governmental interest served by distinguishing between the land use impacts of "Lodgings" and "Residential Care Facilities," on the one hand, and "Boardinghouses," etc., on the other, based solely on the length of residency. These are similarly situated uses to Chestnut Hill.

268.    Once qualified as any of the above, the city then imposes a litany of supplemental restrictions and controls over the land use under Chapter 405-21E, not imposed on non-time restricted residences and which does not serve any legitimate governmental interest.

269.    The city code uses length of residency as a proxy for disability in order to sanitize its intentional discrimination against people with disabilities. The disproportionate impact of regulating these categories of land use based only on residency time, falls on disabled persons, including persons in recovery.

270.    None of these definitions fits Chestnut Hill, since its residents are not transitory, temporary, or short-term – the facility provides them with a long-term residence no different from that enjoyed by the city's non-disabled population.

## COUNT X
## (Violation of N.Y. Human Rights Law)

271.    Plaintiffs repeat and realleges each and every allegation above as if set forth in full herein.

272.    Section 279(9) of the N.Y. Executive Law states, "Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages, including, in cases of employment discrimination related to private employers and housing discrimination only, punitive damages, and such other remedies as may be appropriate, including any civil fines and penalties provided in subdivision four of this section."

273.    The above alleged facts constitute prohibited discrimination against Chestnut Hill and its residents.

### COUNT XI
### (Unconstitutional Discrimination under the NYS Constitution)

274.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

275.    In 2024, New York voters amended Article I, section 11 of the New York State Constitution so that it now provides: "No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, ethnicity, national origin, age, disability, creed [or], religion, or sex, including sexual orientation, gender identity, gender expression, pregnancy, pregnancy outcomes, and reproductive healthcare and autonomy, be subjected to any discrimination in [his or her] their civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state, pursuant to law."

276.    The above alleged facts constitute prohibited discrimination against Chestnut Hill and its residents.

**WHEREFORE**,  based upon the foregoing, Plaintiffs seek the following relief:

On COUNT I, declaring and adjudging that the 2019 special permit conditions violate the FHA and/or ADA, and are therefore null and void ab initio, and voiding all alleged fines and penalties arising from alleged violation of those unlawful conditions and awarding compensatory and punitive damages;

On COUNT II, declaring and adjudging that the city's nuisance proceeding and findings and second denial of special permit renewal were afflicted with discriminatory animus in violation of the FHA and/or ADA, and annulling that proceeding and those findings accordingly and awarding compensatory and punitive damages;

On COUNT III, declaring and adjudging that Defendants' conduct in refusing to consider Chestnut Hill's multiple requests for accommodation violates the ADA and awarding compensatory and punitive damages;

On COUNT IV, declaring and adjudging that Defendants' have engaged in prohibited retaliation under the FHA, ADA, and/or First Amendment and awarding compensatory and punitive damages;

On COUNT V, declaring and adjudging that Defendants have engaged in prohibited content-based regulation of speech on matters of public interest and concern, in violation of the First Amendment and awarding compensatory and punitive damages;

On COUNT VI, declaring and adjudging that Tinti, Stardjok, Van Allen, and Knox conducted warrantless administrative searches and seizures in violation of the Fourth Amendment and awarding compensatory and punitive damages;

On COUNTS VII and VII, declaring and adjudging that defendant Noble's order to remove Chestnut Hill's water supply infrastructure constitutes a violation of Chestnut Hill's substantive and procedural due process rights under the Fifth and Fourteenth Amendments and awarding compensatory and punitive damages;

On COUNT IX, declaring and adjudging those sections of the city code that purport to treat short- or medium-term housing differently and more restrictively violates the FHA and/or ADA;

On Counts X and XI, declaring and adjudging that Defendants' conduct violates Plaintiffs' rights protected by the New York Human Rights Law and/or Article I, section 11 of the New York State Constitution; and

On All Counts: Permanently enjoining the city from taking any further or additional steps to enforce, pursue, or foreclose on any of the foregoing or any or to collect, attempt to collect or enforce any lien arising therefrom; and

Awarding Plaintiffs their attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

Awarding such other and further relief which as to the Court seems just, proper, and equitable.

DATED:  March 25, 2025

YOUNG/SOMMER LLC

By:  _____
William A. Hurst, Esq.
Bar Roll No. 510271
*Attorney for Plaintiffs*
500 Federal Street, 5th Floor
Troy, NY 12180
Tel.: (518) 438-9907
Fax: (518) 438-9901
E-mail: whurst@youngsommer.com