**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CHESTNUT HILL NY, INC., JAE CURTIS, THOMAS
RIKER, and JOHN STURM,

          Plaintiffs,

v.

THE CITY OF KINGSTON, NY; THE CITY OF
KINGSTON ZONING BOARD OF APPEALS; THE
CITY OF KINGSTON PLANNING BOARD; STEVEN
NOBLE, individually and in his capacity as Mayor of the
City of Kingston; SUZANNE CAHILL, individually and in
her capacity as City Planner for the City of Kingston;
STEPHAN KNOX, individually and in his capacity as
Code Enforcement Officer and/or Building Inspector for
the City of Kingston; BARTEK STARODAJ, individually
and in his capacity as Director of Housing Initiatives for
the City of Kingston; EGIDIO TINTI, individually and in
his capacity as Chief of Police of the City of Kingston; and
ERIC J. VANALLEN, individually and in his capacity as
Sergeant on the City of Kingston Police Department,

          Defendants.

1:25-cv-00368 (BKS/DJS)

---

**Appearances:**

*For Plaintiffs:*
William A. Hurst
Hurst Law Firm PLLC
439 Delaware Avenue, PMB 116
Delmar, New York 12054

*For Defendants:*
Barbara Graves-Poller
City of Kingston Corporation Counsel
Matthew M. Jankowski
Assistant Corporation Counsel
420 Broadway
Kingston, New York 12401

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiffs Jae Curtis, Thomas Riker, and John Sturm, are individuals with disabilities and residents of a boarding house and group home for the disabled ("Chestnut Hill") operated by Plaintiff Chestnut Hill NY, Inc., in Kingston, New York. (Dkt. No. 1). The Complaint names the following Defendants: the City of Kingston; the City Zoning Board of Appeals; the City Planning Board; Steven Noble, Mayor of Kingston; Suzanne Cahill, City Planner; Stephan Knox, Code Enforcement Officer and/or Building Inspector; Bartek Starodaj, City Director of Housing Initiatives; Egidio Tinti, Kingston Chief of Police; and Eric J. VanAllen, Sergeant, Kingston Police Department. (*Id.*). The Complaint alleges violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f), Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, et seq., the First, Fourth, and Fourteenth Amendments, 42 U.S.C. § 1983, and state law. Presently before the Court is Defendants' motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 12). Plaintiffs oppose the motion. (Dkt. No. 15). Defendants have filed a reply. (Dkt. No. 18). For the reasons that follow Defendants' motion is granted in part and denied in part.

## II.    BACKGROUND

### A.    *Chestnut Hill I*

This is the third federal action Chestnut Hill NY, Inc., has filed[1] against the City concerning the operation of Chestnut Hill, a boarding house and group home for the disabled located at 106 West Chestnut Street in Kingston, New York. *See Chestnut Hill NY, Inc. v. City of*

---

[1] The parties have also been engaged in state court litigation throughout the same time period.

2

*Kingston ("Chestnut Hill I")*, No. 17-cv-0095 (N.D.N.Y. filed Feb. 22, 2017); *Chestnut Hill NY, Inc. v. City of Kingston ("Chestnut Hill II")*, No. 23-cv-01024 (N.D.N.Y. filed Aug. 21, 2023). *Chestnut Hill I* stemmed from a dispute between Chestnut Hill and the City regarding whether the operation of Chestnut Hill as boarding house was permissible as a non-conforming use that pre-dated the City's zoning code, in an R-1, residential zone. *Chestnut Hill I*, Dkt. No. 1. Following the Court's issuance of a temporary restraining order ("TRO") enjoining the City from removing residents or taking further action to close the group home, *Chestnut Hill I*, 2017 WL 11418271, 2017 U.S. Dist. LEXIS 226807 (N.D.N.Y. Feb. 22, 2017), the parties began discussing settlement, including whether Chestnut Hill could apply to the City for a variance, *Chestnut Hill I*, Dkt. No. 43.

On October 19, 2018, the Zoning Board of Appeals granted Chestnut Hill: (1) a "use variance" allowing it to continue "to operate a boarding home in accordance with the special permit provisions applicable in an R-2 zone, on such terms and conditions as approved by the Planning Board"; and (2) a "variance from such requirements set forth in section 405-12 [of the City Code] as deemed appropriate by the Planning Board." (Dkt. No. 1-2, at 2–3). On April 15, 2019, the Planning Board granted Chestnut Hill's application and issued an annually renewable special permit, enabling Chestnut Hill to continue to operate. (Dkt. No. 1-5). The Planning Board resolution that granted the Special Permit imposed a variety of conditions, all of which Plaintiffs challenge in this action, including a guest registry requirement, a condition prohibiting a sign identifying or advertising the use of a boarding house, that the owner permanently reside in Chestnut Hill or establish a "resident agent," specifications regarding the changing of bed linens and towels, parking, occupancy, and annual inspection and renewal of the special permit. (Dkt.

No. 1, ¶¶ 65–73; *see also* Dkt. No. 1-5 (resolution)). On September 5, 2019, the Court issued an order dismissing *Chestnut Hill I* by reason of settlement. *Chestnut Hill I*, Dkt. No. 74.

    **B.**     ***Chestnut Hill II***

Chestnut Hill "successfully" renewed the special permit in 2020, 2021, and 2022, "but the City denied renewal" of the special permit on July 17, 2023, "citing . . . zoning code violations." (Dkt. No. 1, ¶ 7). Plaintiffs' allegations regarding the events leading to the Planning Board's July 17, 2023, denial of Chestnut Hill's 2023 application to renew the Special Use Permit are set forth at length in *Chestnut Hill II*, No. 23-cv-01024, 2023 WL 6796622, at *2–13, 2023 U.S. Dist. LEXIS 184157, at *3–8 (N.D.N.Y. Oct. 13, 2023). The Court assumes the parties' familiarity with those allegations and does not repeat them here.

On August 21, 2023, Plaintiffs filed *Chestnut Hill II*, alleging (1) disability discrimination in violation of the FHA; (2) interference with Plaintiffs' rights under the FHA; (3) disability discrimination in violation of the ADA; (4) failure to provide a reasonable accommodation, in violation of the ADA; and (5) a due process claim under the Fourteenth Amendment. *Chestnut Hill II*, Dkt. No. 1; *see also id.* Dkt. No. 58 (amended complaint). Shortly after filing the complaint, Plaintiffs moved for a TRO and preliminary injunction seeking to stay the City's eviction proceedings and maintain the status quo. *Chestnut Hill II*, Dkt. No. 5. Following an evidentiary hearing on September 20, 2023, the Court denied Plaintiffs' motion for a TRO from the bench, (Text Minute Entry for Evidentiary Hearing, Sept. 20, 2023), and on October 13, 2023, issued a written decision explaining the denial of the TRO and denying Plaintiffs' motion for a preliminary injunction, *Chestnut Hill II*, No. 23-cv-01024, 2023 WL 6796622, 2023 U.S. Dist. LEXIS 184157 (N.D.N.Y. Oct. 13, 2023). On July 15, 2024, the Court granted, in part, the City's motion to dismiss, dismissing all claims except Plaintiffs' claim of disparate treatment in connection with the denial of Chestnut Hill's application for renewal of the

special permit. *Chestnut Hill II*, No. 23-cv-1024, 2024 WL 3415116, 2024 U.S. Dist. LEXIS 123608 (N.D.N.Y. July 15, 2024). On March 9, 2026, the Court granted the City's motion for summary judgment and dismissed the action. *Chestnut Hill II*, Dkt. No. 26

## III.    FACTS[2]

In general, the present Complaint concerns Defendants' activities during two separate time periods. The first is January 27, 2017 to September 5, 2019, the time period between the filing and settlement of *Chestnut Hill I*, during which the Zoning Board of Appeals granted two variances and the Planning Board granted a special use permit. (Dkt. No. 1, ¶¶ 39–73). The Court has outlined these events above. The second time period concerns the events *following* the Planning Board's July 17, 2023 denial of Chestnut Hill's application to renew its special permit and the filing of this action (July 18, 2023 to March 25, 2025). (*Id.* ¶¶ 83–157). The following is a recitation of those events, as alleged in the Complaint.

### A.    Communication with City Corporation Counsel and New City Zoning Code

On July 20, 2023, three days after the Planning Board's denial of Chestnut Hill's application to renew, City Corporation Counsel Barbara Graves-Poller "insisted that the land use cease immediately and that the disabled persons living there be ejected" and demanded "confidential information about Chestnut Hill's residents." (Dkt. No. 1, ¶ 83).

On August 1, 2023, the City Common Council "adopted an overhaul to the city zoning code, called a 'Form Based Zoning Code.'" (*Id.* ¶ 84). "Under the Form Based Code, Boardinghouses, Emergency Shelters, and Transitional Housing are all singled out using length

---

[2] The facts are drawn from the Plaintiffs' Complaint and its exhibits. (Dkt. No. 1). The Court assumes the truth of and draws all reasonable inferences from the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

of residence" and require a "special permit for those uses in all zones." (*Id.*). The new code does not require a "special permit for non-time limited lodgings or hotels." (*Id.*).

In letters to Chestnut Hill dated August 18, 2023, and August 23, 2023, City Corporation Counsel stated that the "health, safety and welfare of the residents is of paramount concern to the city," and that the City would "do everything in its power to assist in finding safe legal accommodations for [Chestnut Hill's] residents." (Dkt. No. 1-10, at 2–5). In the August 23 letter, Corporation Counsel requested that Chestnut Hill "forward a list with the names of all residents of 106 West Chestnut Street" on the ground that such information "is critical to identify and facilitate accommodations for these residents." (*Id.* at 4). Counsel further stated that in addition to documenting "how previous safety concerns are no longer an issue, including the structural soundness of the fire escape and that any installed fire alarms are functioning," "the property must also be in compliance with the building code." (*Id.* at 4–5). Finally, Counsel advised that in view of the "new city-wide zoning code," "should your client seek to lawfully operate a boarding house at this location . . . your client will need to obtain a use variance from the Zoning Board of Appeals." (*Id.* at 5).

On August 21, 2023, Plaintiffs filed *Chestnut Hill II*. *Chestnut Hill II*, No. 23-cv-1024, Dkt. No. 1. On August 24, 2023, Plaintiffs' attorney emailed Corporation Counsel Matthew Jankowski and attached the complaint filed in *Chestnut Hill II* and stated that Plaintiffs anticipated "applying for a Temporary Restraining Order." (Dkt. No. 1-11, at 2). Plaintiffs' attorney requested that the City "take no drastic measures that will be extremely disturb [sic] the residents at 106 West Chestnut Street" and that a "meeting to discuss a reasonable accommodation that will allow the Boarding Home to continue to function" be scheduled. (*Id.*). Graves-Poller responded in a letter dated August 25 asking that Chestnut Hill "voluntarily

discontinue [the] federal action," questioning Chestnut Hill's argument that the exemptions it seeks from "zoning and building safety requirements" constitute requests for reasonable accommodations, asserting that the FHA and ADA "exist to ensure equal access to housing and public accommodations—not to expose vulnerable individuals (or the public at large) to unsafe conditions." (Dkt. No. 1-12, at 2). Graves-Poller requested that Chestnut Hill: provide a "list of all current building occupants," so that the City can "connect[] current building occupants to available resources"; confirm that it would "not allow additional persons to" move in; and state whether it would discontinue the newly-filed federal action. (*Id.*). The letter was copied to Defendants Mayor Steven Noble, City Building Inspector and Code Enforcement Officer Stephan Knox, and City Planner Suzanne Cahill. (*Id.*).

In an August 30, 2023 letter to Joseph Sangiovanni, who owns Chestnut Hill, NY, Inc., and manages Chestnut Hill, Graves-Poller reiterated the City's request for "contact information for the individuals currently occupying 106 West Chestnut Street so that we can assist them in securing housing-related resources," and noted that Sangiovanni had "refused to provide that information." (Dkt. No. 1-13, at 2). Graves-Poller enclosed with the letter "documents to facilitate our immediate work of connecting current building occupants to social service resources," including 45 copies of a notice "to residents to advise them of the building's status and available resources;" and "a ledger for you to complete that will identify each current building occupant." (*Id.*). The notice is addressed to the residents of Chestnut Hill and advises that "the property owner's Special Permit for a Boarding House was denied . . . based on failure to comply with the City's Administrative Code," and that Chestnut Hill "cannot legally operate as a boarding house." (*Id.* at 3). The Notice states that the "Building Department will continue inspecting the building to assess the status of previously identified dangerous conditions." (*Id.*).

It further states that all residents must vacate the property within thirty days, but that the City was available "to assist . . . in finding safe, alternative housing," and listed phone numbers of several social services agencies. (*Id.*). The Notice directs residents to enter through the front door only and stated that entry through any other window or part of the building was "unsafe, unlawful, and dangerous." (*Id.*).

### B.      Inspection and Notice of Public Nuisance Violations

On September 1, 2023, Defendant Eric Kitchen, City Zoning Officer, issued a "'Notice of Violations and Order to Remedy,' citing three provisions of the newly adopted 'Form Based Code.'" (Dkt. No. 1, ¶ 97; Dkt. No. 1-14, at 2–3). The notice stated that: (1) Chestnut Hill was "located in a T3N Zone," that "[t]he operation of a Boarding House is not an allowable use in a T3N zone," that "[a]s this use is not an allowable use," it was "in violation of the . . . Zoning Code" and subject to a fine of up to $500 per day and that if the violation was not corrected by October 2, an action would be "brought in the City of Kingston Court," (2) Chestnut Hill was in violation of the code's licensing provision, which prohibited the operation of a boardinghouse without a license, (3) Chestnut Hill was in violation of the "keeping of register provision," which required that a guest register be kept and made available to "the Building Inspector/Code Enforcement Officer." (Dkt. No. 1-14, at 2–3). Kitchen advised that the latter two violations were "punishable by a fine of $200" per day for each day "the premises are operated in violation" of the code's provisions. (*Id.* at 4).

On September 6, 2023, the City "claimed, for the first time in the structure's 70-year history, the front steps lacked required handrails" and issued a notice of violation. (Dkt. No. 1, ¶ 102) (emphasis omitted). The City also cited Chestnut Hill for erecting two "decorative exterior columns" without a building permit. (*Id.*).

On September 8, 2023, Knox, Kitchen, and three others attempted to inspect Chestnut Hill. (Dkt. No. 1-14, at 5). Sangiovanni refused to consent to the inspection. (Dkt. No. 1, ¶ 103; Dkt. No. 1-14, at 5).

On October 13, 2023, the City filed a complaint in Ulster County Supreme Court against Chestnut Hill NY, Inc. and Sangiovanni seeking a declaration that, among other things, Chestnut Hill is in violation of the City's Administrative Code, enjoining Chestnut Hill's operation as a boarding house, and awarding the City all "fines, fees, and penalties imposed in connection with defendants' unlawful actions."[3] (Dkt. No. 12-5, at 14–15).

On November 1, 2023, Defendant Bartek Starodaj, Zoning Enforcement Officer, issued Chestnut Hill a "Notice of Violations Constituting a Public Nuisance" based on the Chestnut Hill's continued operation of a boarding house in a T3N zone, operation of a boarding house without a license, and failure to keep and provide a register with guest information.  (Dkt. No. 1, ¶ 107; Dkt. No. 1-15, at 3–4). Starodaj ordered Chestnut Hill "to eliminate the Public Nuisance by providing records as required under [the zoning code] and ceasing all operation of the boarding house . . . by December 2, 2023." (Dkt. No. 1-15, at 4; Dkt. No. 1, ¶ 107).

### C.        Request to Planning Board for Special Permit

At a December 18, 2023 meeting, the Planning Board considered Chestnut Hill's application for a "special permit to operate a boarding house." (Dkt. No. 1-16, at 5). According to meeting minutes, Cahill advised Sangiovanni that she believed the "use variance to operate a boarding house in an R-1 zone" was "still valid" because even though Chestnut Hill was in a T3N zone, per the new zoning code, "the use variance runs with the land," (*id.*), but that the

---

[3] The City's commencement of an action in state court is not referenced in the Complaint. The City filed a copy of the state court complaint in support of its motion to dismiss, and the Court takes judicial notice of the fact of the state court complaint.

Planning Board "c[ould ] not act on the 2nd variance," which authorized "certain conditions to be included in a special permit and [allowed] the Planning Board to waive specific requirements listed in the zoning code at the time," because "[t]hose sections are no longer part of the [zoning] code," (*id.* at 6).

Planning Board member K. Grundig "asked about the safety issues that were part of the previous conversation that resulted in denial of the special permit, including the issues with the fire escape." (*Id.* at 6). Sangiovanni replied that the property had been inspected "at least 5 times" and Chestnut Hill's attorney advised that an August 15, 2023 report had been submitted to the Building Department certifying the structural soundness of the fire escape. (*Id.*). Cahill noted that it "had not been included in the special permit application and that a copy should be provided" and Corporation Counsel Jankowski acknowledge that he had received a copy of the report but had "not shared it with other agencies." (*Id.*). Cahill advised Sangiovanni that the Zoning Code requires boarding houses "to be licensed with the City Clerk" and that Chestnut Hill's "Operating Plan" would need to be reviewed. (*Id.*). The Planning Board tabled the application pending the submission of additional information. (*Id.* at 8).

### D.    Public Nuisance Finding

On December 26, 2023, Corporation Counsel Jankowski issued Chestnut Hill a notice of hearing date, January 12, 2024, regarding the violations alleged in the Notice of Public Nuisance. (Dkt. No. 1-15, at 2). Following the hearing, "a panel of mayor appointed persons . . . issue[d] 'Findings of Fact and Recommendations' relative to the" Public Nuisance allegations. (Dkt. No. 1, ¶ 121; Dkt. No. 1-17, at 2). The panel found that Chestnut Hill was using the premises for a business, activity, or enterprise that was not licensed and that "there exists or is . . . occurring a violation of the Zoning Ordinance." (Dkt. No. 1-17, at 2). The panel recommended that Mayor Noble issue a decision directing payment of a fine of $250 per day, ordering compliance with all

10

applicable codes and regulations, and "immediate fire [and] life [and] safety inspection . . . if the premises continue[] to be occupied to establish no code violations which could cause harm or injury to be conducted by the Building Safety Department." (*Id.*).

**E.      Denial of Special Permit**

On January 16, 2024, the Planning Board issued a resolution denying Chestnut Hill's application for a special use permit, finding that: Chestnut Hill "continues to operate the boarding house following the denial of the special permit on July [17], 2023"; on August 31, 2023, the Building and Safety Department had posted a notice of unlawful operation on Chestnut Hill and that residents must vacate, and, at the time of posting, noticed the absence of guardrails from the front steps and that construction was being performed without a permit; between July 17, 2023 and January 16, 2024, City emergency services had received and responded to "approximately 30 calls to the premises"; Chestnut Hill had not complied with the New York State Uniform code, Kingston building code, the Code of the City of Kingston, or "the conditions prescribed by the Board in conjunction with the issuance of the original permit"; and "the intentional and blatant disregard by the [Chestnut Hill] to comply with the City of Kingston Code following the denial and revocation of the special permit on July 17, 2023, including the affirmative actions taken to prevent City Officials from conducting inspections, poses a danger to the health, safety, and wellbeing of its residents and the residents of the City of Kingston." (Dkt. No. 1-18, at 5–6).

**F.      Order to Vacate and Fines**

On January 23, 2024, the City placed a sign on Chestnut Hill stating "Closed by Administrative Order By the City of Kingston" and that "premises must be vacated by 10AM" on January 29, 2024. (Dkt. No. 1-19, at 2). "The city also installed a surveillance camera directed at and filming Chestnut Hill's front door. It did so after already commanding the residents to

enter and ex[it] ONLY through the front door . . . without consent or knowledge of the occupants." (Dkt. No. 1, ¶ 126).[4]

On February 4, 2024, Mayor Noble issued a Notice to Chestnut Hill in connection with the administrative panel's public nuisance finding, directing the City Clerk "to record the fines Chestnut Hill, Inc. has accumulated to date," at a rate of $250 per day, "for conducting, maintaining, permitting or allowing the existence of Public Nuisance at 106 West Chestnut Street . . . from July 18, 2023 through January 31st, 2025 to be $140,750." (Dkt. No. 1-20, at 2).

### G.    Attempts to Vacate Chestnut Hill

On January 29, 2024, Starodaj and city law enforcement agents "entered the Chestnut Hill residence without consent or a warrant, shouting, in sum and substance, 'You need to leave here immediately, or you will be arrested.'" (Dkt. No. 1, ¶¶ 127–28). Starodaj "entered the private areas of the Chestnut Hill residence." (*Id.* ¶¶ 128–29). Starodaj again entered Chestnut Hill without consent or a warrant on January 30 and 31, 2024, and February 2, 6, 8, and 9, 2024, "each time encouraging and directing various social services personnel to join him inside the private residence." (*Id.*).

On March 5, 2024, Defendant Eric Van Allen, Sergeant, Kingston City Police Department, along with "six, armed and uniformed city law enforcement officers entered the private areas of the Chestnut Hill residence without consent or a warrant." (*Id.* ¶ 131). Sgt. Van Allen and the other officers "bang[ed] on . . . private bedroom doors and threaten[ed] residents," including Plaintiffs Curtis, Riker, and Sturm. (*Id.* ¶ 132). "The same set of events repeated itself again on" March 14, 22, and 25, 2024. (*Id.* ¶ 134).

---

[4] The Complaint does not indicate when the camera was installed.

At 5:00 a.m., on April 16, 2024, Defendant Edigio Tinti, Chief of Police, and at least ten uniformed City law enforcement officers, "entered the private areas of the Chestnut Hill residence and ordered all residents and staff to gather in the foyer," where they were informed by a sergeant that: "You knew this day was coming, we are here and we are not leaving until each and every one of you are out of this building." (*Id.* ¶ 136). Chief Tinti told Plaintiff Riker that he possessed a document from "a court judge" ordering the "forcible removal" of residents. (*Id.* ¶ 137). The document indicated that Chestnut Hill was operating without a special permit "given that the planning board had refused to renew it." (*Id.* ¶ 138). This "raid" "lasted for ten (10) hours, during which time law enforcement and city building and zoning officials (including Defendant [Starodaj]) entered locked rooms, threatened and harassed . . . residents . . . with arrest or forced displacement." (*Id.* ¶ 139).

### H.    Water to Chestnut Hill Disconnected and Additional Fees

Chestnut Hill had an "unpaid water bill" and owed the City between $3,200 and $7,200. (Dkt. No. 1, ¶ 142). On April 18, 2024, Mayor Noble entered a "private agreement" with Carl Bell, a "then present or former city water official," authorizing the excavation and removal of Chestnut Hill's "curb box," "which is a box valve device owned by Chestnut Hill that generally demarcates the boundary between municipal water supply and its distribution via private pipes and lines." (*Id.* ¶¶ 141, 143). As a result, Chestnut Hill was disconnected from, and left without, running water. (*Id.* ¶ 141). Prior to hiring Bell, Mayor Noble had ordered two officials within the City's water department to remove Chestnut Hill's curb box but both refused. (*Id.* ¶¶ 147–48). Chestnut Hill was without water until July 8, 2024, when Ulster County Supreme Court Judge Julian D. Schreibman ordered the City to restore the water supply. (*Id.* ¶ 150). "The City then delayed another two (2) weeks before permitting Chestnut Hill to replace the water supply and only did so upon further directive from Justice Schreibman." (*Id.* ¶ 151).

On November 6, 2024, Knox identified certain "fittings in Chestnut Hill's disposal (sewage) line" and on November 11, 2024 sent a notice to remedy. (*Id.* ¶¶ 153–54). Knox sent additional notices to remedy on November 13, 2024, December 20, 2024, and January 8, 2025. (*Id.* ¶¶ 154–56). On January 9, 2025, Knox assessed a $3,000 fee against Chestnut Hill "to pay for his building and code inspections" and "assessed [additional] fines and fees" on January 14 and 28, 2025. (*Id.* ¶ 157).

## I.    Causes of Action

On March 25, 2025, Plaintiffs filed the instant complaint asserting the following causes of action: (1) disparate treatment based on disability in connection with the original special permit requirement and conditions, in violation of FHA; (2) disparate treatment based on disability in connection with the nuisance finding and second denial of special permit, in violation of the FHA; (3) denial of reasonable accommodation as to registry, room capacity, and inspection requirements, in violation of the FHA and ADA; (4) retaliation in violation of the FHA, ADA, and First Amendment; (5) content-based regulation of speech, in violation of the First Amendment; (6) unreasonable search and seizure, in violation of the Fourth Amendment; (7) denial of substantive and procedural due process, in violation of the Fourteenth Amendment; and (8) denial of due process of law, in violation of the Fourteenth Amendment; (9) that the City Code has a disparate impact on the disabled, in violation of the FHA; (10) discrimination in violation of the New York State Human Rights Law; and (11) discrimination in violation of the New York State Constitution. (*Id.* ¶¶ 160–276).

## IV.    STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). The Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## V.    DISCUSSION

### A.    Materials Outside the Complaint

Before addressing Defendants' motion, the Court must determine whether it may consider any of the documents and declarations attached to the parties' motion papers. "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself," *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006), and "documents attached to the complaint as exhibits," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Faulkner*, 463 F.3d at 134 (collecting cases). "A complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers*, 282 F.3d at 152). "A document is incorporated by reference if the complaint makes, 'a clear, definite and substantial reference to the document[].'" *Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 608 (E.D.N.Y. 2017) (quoting *McLennon v. City of New York*, 171 F. Supp. 3d 69, 88 (E.D.N.Y. 2016)). "Where a document is not incorporated by reference, the court may

15

nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Nicosia*, 834 F.3d at 230 (quoting *DiFolco*, 622 F.3d at 111). "[E]ven if a document is 'integral,' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134 (citation omitted). "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Nicosia*, 834 F.3d at 231 (quoting Fed. R. Civ. P. 12(d)).

In support of their motion, Defendants submitted: an affirmation by Corporation Counsel (Dkt. No. 12-2); this Court's 2017 Order dismissing Chestnut Hill I, (Dkt. No. 12-3); a list of "Chestnut Hill City of Kingston Court dates," (Dkt. No. 12-4); the complaint the City filed in Ulster County Supreme Court, (Dkt. No. 12-5); the "State Court Answer," (Dkt. No. 12-6); the "State Court December 2023 Order," (Dkt. No. 12-7); email exchanges between the parties' attorneys, (Dkt. No. 12-8), a letter and affidavit filed in the state court action, (Dkt. No. 12-9); and the state court's July 2023 order on summary judgment, (Dkt. No. 12-10).

In support of their opposition, Plaintiffs submitted: a declaration by Joseph Sangiovanni, (Dkt. No. 15-1); Chestnut Hill's "House Rules," (Dkt. No. 15-2); the complaint the City filed in Ulster County Supreme Court, (Dkt. No. 15-3); the City Court Complaint, (Dkt. No. 15-4); "Articles and Comments," (Dkt. No. 15-5); "Engineer Reports," (Dkt. No. 15-6); and Planning Board meeting minutes, email, and resolutions, (Dkt. No. 15-7).

16

"[C]ourts routinely take judicial notice of documents filed in other courts, ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). The Court therefore takes judicial notice of the 2017 Order dismissing *Chestnut Hill I*, (Dkt. No. 12-3); the complaint the City filed in Ulster County Supreme Court, (Dkt. No. 12-5; Dkt. No. 15-3; the "State Court Answer," (Dkt. No. 12-6); the "State Court December 2023 Order," (Dkt. No. 12-7); the state court's July 2023 order on summary judgment, (Dkt. No. 12-10); and the City Court Complaint, (Dkt. No. 15-4). The Court otherwise disregards the remaining submissions as there is no indication they are incorporated by reference in, or integral to, the Complaint.

### B.    Res Judicata

In their first cause of action, Plaintiffs bring a facial and as-applied challenge to the "imposition of the special permit requirement" and the conditions that the Planning Board established when granting the April 2019 special permit, arguing that they are discriminatory and constitute an "onerous burden which has the effect of limiting the ability of disabled persons to live in the residence of their choice," in violation of the FHA, 42 U.S.C. § 3604(f). (Dkt. No. 1, ¶¶ 160–71). Plaintiff requests that the Court declare that these conditions are not only "void under the FHA," but unenforceable, and that any use of these conditions to conduct searches or impose fines "lack any force or effect." (*Id.* ¶ 171). Defendants move for dismissal on the ground that this Court's September 2019 order dismissing *Chestnut Hill I* by reason of settlement was a final judgment for res judicata purposes and bars this claim.[5] (Dkt. No. 12-1, at 13–15 (citing *Chestnut Hill I*, Dkt. No. 74)). Plaintiffs oppose Defendants' motion. (Dkt. No. 15, at 19–24).

---

[5] In a footnote, Defendants also argue this claim is barred by the FHA's two-year statute of limitations. (Dkt. No. 12-1, at 15 n.11). Plaintiffs did not respond to this argument and the Court declines to address it here.

17

Res judicata precludes subsequent litigation where "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [same parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Pike v. Freeman*, 266 F.3d 78, 91 (2d Cir. 2001) (citations omitted).

### 1.     Adjudication on the Merits

The doctrine of res judicata "provides that a final judgment on the merits bars a subsequent action between the same parties over the same cause of action." *Channer v. Dep't of Homeland Sec.*, 527 F.3d 275, 279 (2d Cir. 2008). "It is clear that a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment for res judicata purposes." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002); *see Greenberg v. Bd. of Governors of Fed. Rsrv. Sys.*, 968 F.2d 164, 168 (2d Cir. 1992) (observing that settlements, like court judgments, "may also have preclusive effect" (citing *May v. Parker–Abbott Transfer & Storage Inc.*, 899 F.2d 1007, 1009 (10th Cir. 1990)). "[H]owever . . . a prior judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." *Marvel Characters, Inc.*, 310 F3d at 287 (quoting *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955)). Nor does "res judicata . . . bar subsequent litigation when the court in the prior action could not have awarded the relief requested in the new action." *Id.*

On September 5, 2019, *following* the ZBA's grant of two variances (on October 19, 2018), (Dkt. No. 1-2), and the Planning Board's issuance of the special permit with conditions (on April 15, 2019), (Dkt. No. 1-5), the Court issued an Order of Dismissal by Reason of Settlement, dismissing the action with prejudice "on the sixty-first day following the date of this Order, unless any party moves to reopen this case," *Chestnut Hill I*, Dkt. No. 74, at 2. As no party moved to reopen, the action was dismissed with prejudice. Thus, *Chestnut Hill I* concluded

18

with a final adjudication on the merits and Defendants have satisfied the first prong. *See Marvel Characters, Inc.*, 310 F.3d at 287; *see also Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986) ("A dismissal with prejudice arising out of an agreement of the parties is an adjudication of all matters contemplated in the agreement, and a court order which memorializes this agreement bars further proceedings."); *Rosado-Acha v. Red Bull Gmbh*, No. 15-cv-7620, 2016 WL 3636672, at *11, 2016 U.S. Dist. LEXIS 84543, at *32 (S.D.N.Y. June 29, 2016) ("With regard to the first requirement for res judicata, a final judgment on the merits, '[i]t is clear that a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment for res judicata purposes.'" (alteration in original) (quoting *Marvel Characters*, 310 F.3d at 287)).

### 2. Privity of the Parties

"It is well settled in this circuit that literal privity is not a requirement for res judicata to apply." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000) (citing *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995)). "Whether there is privity between a party against whom claim preclusion is asserted and a party to prior litigation is a functional inquiry in which the formalities of legal relationships provide clues but not solutions." *Chase Manhattan Bank*, 56 F.3d at 346.

*Chestnut Hill I* involved two of the same parties—Plaintiff Chestnut Hill NY, Inc. and Defendant City of Kingston. But this case involves, in addition, the ZBA, the Planning Board, and the individual Defendants in their official and personal capacities, as well as three individual Plaintiffs, none of whom were parties in *Chestnut Hill I*. Although not named defendants in *Chestnut Hill I*, as City entities, the ZBA and Planning Board are in privity with the City for purposes of res judicata. *See Brodsky v. New York City Campaign Fin. Bd. by Weisman*, 796 F. App'x 1, 5 (2d Cir. 2019) ("Because the Board is a New York City agency, the City is also in privity with the Board."). Defendants, Noble, Cahill, Knox, Starodaj, Tinti, and VanAllen, who

19

were not named as defendants in *Chestnut Hill I*, either, are also in privity with the City to the extent they are sued in their official capacities. *See Smith v. City of New York*, 130 F. Supp. 3d. 819, 828 (S.D.N.Y. 2015) ("Government officials sued in their official capacities are generally considered to be in privity with the government entity that they serve." (quoting *Johnson v. Cty. of Nassau*, 480 F. Supp. 2d 581, 607 (E.D.N.Y. 2007)), *aff'd* 664 F. App'x 45 (2d Cir. 2016)). However, "[a] government official sued in his or her personal capacity . . . is not considered in privity with the government," *Johnson*, 480 F. Supp. 2d at 607, and as Defendants have not proffered any argument as to privity, or any other argument as to these individuals, the Court does not analyze this issue further. Nor have Defendants proffered any argument as to whether the three individual Plaintiffs, none of whom were parties to *Chestnut Hill I*,[6] are in privity with Chestnut Hill NY, Inc. [7] The Court therefore does not address the privity of the individual Plaintiffs, either. In any event, having found privity as to the City, the ZBA, the Planning Board, and the individual Defendants in their official capacities, the Court proceeds to the third prong as to these Defendants.

### 3.    Identity of Claims

In weighing the third factor, courts consider "whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Monahan*, 214 F.3d at 289 (quoting *NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983)). "The doctrine[] of

---

[6] Even though the individual Plaintiffs were not parties to *Chestnut Hill I*, they were parties to *Chestnut Hill II*, where they challenged the Special Permit requirement and condition and which has been dismissed. In any future motions, the parties should address whether principles on claim or issue preclusion bar this claim as to the individual Plaintiffs and the individual Defendants in the personal capacities.

[7] The only argument concerning privity in Defendants' brief is the following assertion: "slight variations in the captioned parties cannot defeat claim preclusion when the interests represented remain constant." (Dkt. No. 12-1, at 13).

res judicata . . . [is] designed to protect 'litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation.'" *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998) (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)). In deciding whether a suit is barred by res judicata, "[i]t must first be determined that the second suit involves the same 'claim' or— 'nucleus of operative fact'—as the first suit." *Channer*, 527 F.3d at 280 (quoting *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000)). "To determine whether two actions arise from the same transaction or claim, we consider 'whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir. 2014) (quoting *Pike*, 266 F.3d at 91).

In *Chestnut Hill I*, Chestnut Hill NY, Inc., alleged that the City's "land use actions," which resulted in a determination by the ZBA that the boarding house was an impermissible non-conforming use and a 2016 order to vacate, constituted intentional disability discrimination in violation of the FHA and ADA. (Dkt. No. 1, at 4–5). In February 2017, this Court issued a TRO enjoining the City from removing residents or taking further action to close the group home. *Chestnut Hill I*, 2017 WL 11418271, 2017 U.S. Dist. LEXIS 226807 (N.D.N.Y. Feb. 22, 2017). The Court extended the TRO for more than two years while the parties engaged in an extensive settlement process that led to the ZBA's granting of two variances and the Planning Board's issuance of a Special Permit with conditions and requirements of operation. In September 2019, after the Special Permit had been issued, the parties settled the matter, and the Court issued an

21

Order of Dismissal by Reason of Settlement. *See Chestnut Hill I*, Dkt. No. 74 (Order of Dismissal).

In the first cause of action Plaintiffs seek a declaration that "the 2019 special permit conditions are . . . void under the FHA" and that any "violations of these conditions, including those later used to leverage liens, fines, the nuisance finding, and warrant searches, are void, unenforceable, and lack any force and effect." (Dkt. No. 1, ¶ 171). Plaintiffs argue that they are "entitled to challenge the discriminatory nature of the conditions that were first embedded in the 2019 permit" and that the prior dismissal following settlement did not "adjudicate the legality of conditions not yet imposed, nor does it confer immunity on discriminatory provisions that burden disabled persons in perpetuity." (Dkt. No. 15, at 20).

As stated above, the order of dismissal by reason of settlement was entered on September 5, 2019, *following* the Planning Board's April 15, 2019 issuance of the special permit with conditions. (Dkt. No. 1-5). Further, the parties had sixty days to move to reopen the case following the order of dismissal, *Chestnut Hill I*, Dkt. No. 74, at 2, but neither party filed a motion to reopen and the matter was therefore dismissed with prejudice. Thus, Plaintiffs' suggestion that the settlement and dismissal did not encompass the 2019 Special Permit conditions is without merit. Indeed, the Second Circuit rejected a similar argument in *Monahan*, 214 F.3d at 289. There, the plaintiff correction officers argued that Department of Corrections' sick leave policy was facially violative of the constitution and unconstitutionally applied. *Id.* at 279. The district court found that the plaintiffs' claims were barred by res judicata based on an earlier lawsuit challenging the sick leave policy that was brought by the president of the plaintiff-officers' union. *Id.* at 279–80. The earlier action was settled, resulting in a stipulation (approved by the district court) reflecting the parties' agreement to revise the sick leave policy following

22

settlement. *Id.* at 280–81. On appeal, the plaintiffs argued there was no identity of claims because the revised sick leave policy was not the same policy challenged in the earlier action. *Id.* at 289. The Second Circuit rejected this argument:

> This semantic cartwheel would virtually eliminate the doctrine of res judicata for a significant subset of those claims resolved by settlement agreement. Parties would have no incentive to modify a controversial policy if the amended version was subject to renewed attack. The efficiencies created by a mutually agreeable settlement would be lost.

*Id.* Here, not only had Chestnut Hill had received the Special Permit and its conditions *prior* to settlement in *Chestnut Hill I*, but it had sixty days within which to reopen the case but did not do so. *See Waldman v. Vill. of Kiryas Joel*, 39 F. Supp. 2d 370, 378 (S.D.N.Y. 1999) ("The case law makes clear that the relevant inquiry [for res judicata] is . . . whether a particular claim *could have been raised* in a prior suit.") (emphasis added), *aff'd*, 207 F.3d 105 (2d Cir. 2000). Thus, the Court rejects Chestnut Hill's assertion that there is no identity of issues between C*hestnut Hill I* and the first cause of action with respect to the Special Permit.

Chestnut Hill next contends that new incidents arising from the application of the Special Permit and its conditions, namely the Planning Board's denials of its application to renew the Special Permit, enable it to raise new "as-applied" challenges to the conditions because "[e]ach re-application of those conditions produces a fresh injury." (Dkt. No. 15, at 20–21). To evaluate this argument, the court must "look to see 'whether the same transaction or *connected series of transactions* is at issue." *Monahan*, 214 F.3d at 289 (quoting *United Technologies*, 706 F.2d at 1260). "'Transaction' must be given a flexible, common-sense construction that recognizes the reality of the situation." *Id.* (quoting *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997)). "[T]he pleading of subsequent acts will not defeat res judicata when these additional facts arise from the same core of operative facts." *Waldman*, 39 F. Supp. 2d at 379.

23

The claim that the City was discriminating against Chestnut Hill on the basis of disability by subjecting Chestnut Hill to the conditions of the Special Permit arises from the "same core operative facts" as *Chestnut Hill I*, namely that the City's application and enforcement of its land use regulations with respect to Chestnut Hill was discriminatory. Chestnut Hill's pleading of subsequent acts through the City's application of the conditions of the Special Permit at each renewal does not defeat res judicata because "these additional facts arise from the same core of operative facts." *Id.*; *see Monahan*, 214 F.3d at 289 (finding the "[p]laintiffs' assertion of new incidents arising from the application of the challenged policy is also insufficient to bar the application of res judicata"); *see also Waldman*, 39 F. Supp. 2d at 379 (finding prior and present actions which "involved discrimination in zoning, discrimination in the provision of housing, and the existence of a theocracy, respectively, were . . . a convenient trial unit, and indeed, the facts of these actions are related in time, origin and motivation"). All the conditions Plaintiffs challenge at present, including the requirement of a Special Permit subject to renewal were present and formed prior to, and as part of, the settlement of *Chestnut Hill I. See Monahan*, 214 F.3d at 290 (observing that "[w]here all requirements are met, *res judicata* can act as a bar to virtually any sort of claim," explaining that "[i]f the new as-applied challenges are to aspects of the policy which survive the earlier litigation, then the claim itself was subsumed by the earlier litigation" and "[i]f the as-applied challenges arise from new provisions of the policy to which an authorized representative has agreed, the members are bound by their representative's decision"). Accordingly, Plaintiffs' first cause of action is barred by res judicata as to the City, ZBA, Planning Board, and the individual Defendants in their official capacities.[8]

---

[8] This holding therefore bars Chestnut Hill's argument (1) that the Special Permit and its conditions are void on the ground that they are facially discriminatory and (2) that each time the City required Chestnut Hill to satisfy the conditions, there was a new violation. This holding, of course, does not bar the argument that a Defendant falsely claimed Chestnut Hill failed to comply with the special permit or conditions as pretext for discrimination or retaliation.

24

### C.    Duplicative Claims

Defendants move to dismiss all "claims that repackage issues in the 2023 case" as duplicative. (Dkt. No. 12-1, at 15). However, as the Court recently dismissed *Chestnut Hill II*, and the law governing duplicative lawsuits only applies to pending actions, Defendants' argument is denied as moot. *See Fido's Fences, Inc. v. Radio Sys. Corp.*, 999 F. Supp. 2d 442, 453 (E.D.N.Y. 2014) (refusing to dismiss on duplication grounds where prior pending case was dismissed with prejudice and observing that "there is currently only one lawsuit pending before the court and that the threat of duplicative litigation no longer exists").[9]

### D.    *Younger* Abstention

Defendants assert that this Court should abstain from adjudicating "all causes of action not barred by res judicata and duplicative pleading rules" pursuant to the *Younger* abstention doctrine because there is a "parallel state court case" pending in Ulster County Supreme Court. (Dkt. No. 12-1, at 20–23). *See Younger v. Harris*, 401 U.S. 37 (1971). Plaintiffs oppose abstention and assert that neither *Younger* nor any other abstention doctrine applies. (Dkt. No. 15, at 28–31).

"*Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Younger*, 401 U.S. at 43–44). The *Younger* doctrine creates "narrow" circumstances under which federal courts'

---

Nor would it prevent Chestnut Hill from arguing that new circumstances arose necessitating a reasonable accommodation for one of the conditions. *See Monahan*, 214 F.3d at 290 ("[C]hanged circumstances may sufficiently alter the factual predicate such that new as-applied claims would not be barred by the original judgment."). Indeed, the parties appear to recognize this as these or similar arguments were made in *Chestnut Hill II*, and neither party claimed that res judicata barred the intentional discrimination claims alleged.

[9] The parties have not had an opportunity to address the impact of the Court's recent dismissal of *Chestnut Hill II*, and this decision does not preclude a new motion to dismiss based on that decision.

abstention from their "virtually unflagging" obligation "to hear cases within their jurisdiction" is appropriate. *Cavanaugh v. Geballe*, 28 F.4th 428, 430, 432 (2d Cir. 2022) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

On October 13, 2023, the City initiated the state court action by filing a complaint in Ulster County Supreme Court naming Chestnut Hill NY, Inc. and Sangiovanni as defendants and seeking: a declaration that, among other things, Chestnut Hill is in violation of the City's Administrative Code: an order enjoining Chestnut Hill's operation as a boarding house; and an award of all "fines, fees, and penalties imposed in connection with defendants' unlawful actions."[10] (Dkt. No. 12-5, at 14–15). Chestnut Hill has not disputed that its present claims "involve or call into question" the state court action—nor could it. Here, it seeks an order declaring that: Defendants' application and enforcement of its land use regulations, including the Administrative Code is discriminatory in violation of the FHA; Defendants' denial of a reasonable accommodation, is retaliatory in violation of the FHA, ADA, and First Amendment; Defendants violated Plaintiffs' First and Fourth Amendment rights through unconstitutional

---

[10] The first cause of action in the state court complaint alleges zoning violations and seeks a declaration that "since July 18, 2023, Chestnut Hill has operated a boarding house . . . in violation of the City of Kingston's Administrative Code and is therefore liable for all fees, fines, and penalties recoverable for its zoning violations." (Dkt. No. 12-5, ¶¶ 37–45 (citing City Admin. Code § 405.5(C) (prohibiting unlawful operation of boardinghouses in the City's 'T3' Neighborhood Zoning Transect without a variance), § 405.26(J)(4) (allowing daily fines of $500)). The second cause of action alleges that "Chestnut Hill refused to provide a copy of its guest register to the City's Building Inspector/Code Enforcement Officer" in violation of Chapter 277 of the City's Administrative Code and seeks a declaration that Chestnut Hill has been in violation of that provision since July 18, 2023 and is liable for all applicable fees, fines, and penalties. (*Id.* ¶¶ 46–50). In the third cause of action, the City seeks a declaration that Sangiovanni has refused to provide the City with a copy of the guest register in violation New York General Business Law § 204. (*Id.* ¶¶ 51–55). In the fourth cause of action, the City alleges, and seeks a declaration that, "Chestnut Hill's online advertising includes materially misleading descriptions of the certification and support services offered at the boardinghouse," in violation of New York General Business Law § 349. (*Id.* ¶¶ 56–61). In the fifth cause of action the City alleges that Chestnut Hill "constitutes a public nuisance" because: there is "significant open and ongoing Building Code, permitting and safety violations"; there is "unauthorized and illegal work that create[s] a . . . risk of danger for residents of surrounding buildings and the community"; and the boarding house is being operated without a variance, in violation of Section 405.5(C) of the City's Administrative Code. (*Id.* ¶¶ 62–69). In connection with the fifth cause of action, the City seeks an order declaring the boarding house a "public nuisance and permanently enjoining defendants from operating that boardinghouse unless and until all" Building Code, safety issues, zoning violations, and unpermitted and illegal work are remediated. (*Id.* ¶ 71).

content-based regulation of speech; Defendants violated Plaintiffs' Fourth Amendment right to be free from unreasonable search and seizure through unlawful inspections; Defendants violated the Fourteenth Amendment's Due Process Clause; and Defendants violated state law. In addition, Chestnut Hill seeks an injunction "[p]ermanently enjoining the city from taking any further or additional steps to enforce, pursue, or foreclose on any of the foregoing . . . or to collect, attempt to collect or enforce any lien arising therefrom." (Dkt. No. 1, at 55). Having concluded that Chestnut Hill's claims involve or call into question ongoing state proceedings, the Court must consider whether this is one of the "narrow" circumstances under which abstention would be appropriate.

The *Younger* abstention doctrine applies in only three "exceptional circumstances" involving: (1) ongoing state criminal prosecutions, (2) certain "civil enforcement proceedings," and (3) "pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) (citations and internal punctuation omitted). Where one of *Sprint's* categories is implicated, *Younger* abstention is required. *See Cavanaugh*, 28 F.4th at 433. Defendants contend the state action falls into the second category. (Dkt. No. 18, at 13).

The Supreme Court has described state enforcement proceedings as "akin to a criminal prosecution in important respects": (1) they "are characteristically initiated to sanction the federal plaintiff . . . for some wrongful act"; (2) "a state actor is routinely a party to the state proceeding and often initiates the action"; (3) and "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges." *Sprint*, 571 U.S. at 79–80 (quotation marks omitted).

27

The City, a state actor, initiated the state action to enjoin Chestnut Hill (the federal plaintiff), from violating the City code and to obtain an award of fine, fees, and penalties. The first two aspects of the civil enforcement proceeding described in *Sprint* are therefore present. Further, while there is no indication of a formal investigation, the City filed the state court action following the City Zoning Officer's issuance of a notice of violation and order to remedy, (Dkt. No. 12-5, at ¶¶ 17–18), and a "violation appearance ticket" for the zoning ordinance and local law violations observed at a prior attempted inspection by the Building Safety Department, (*id.* ¶ 32). This is sufficient to place the state court proceeding in the second *Younger* category. *See Jagoda v. City of Saratoga Springs*, No. 25-cv-860, 2025 WL 3672555, at *5, 2025 U.S. Dist. LEXIS 262018, at *10–11 (N.D.N.Y. Dec. 18, 2025) (finding that "[r]egardless of whether the "local enforcement action" the city filed against the plaintiff in city court in connection with the plaintiff's alleged violations of city code, "is criminal prosecution or a civil enforcement proceeding," it fell "squarely within the class of proceedings to which *Younger* applies")

Before invoking *Younger*, a federal court may also "appropriately consider three additional factors laid out" in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982), which, when present, "further counsel in favor of abstention." *Cavanaugh*, 28 F.4th at 432 (quoting *Sprint*, 571 U.S. at 81) (brackets omitted). These non-dispositive *Middlesex* factors are whether there is (1) an "ongoing state judicial proceeding" that (2) "implicates important state interests" and (3) "provides an adequate opportunity to raise federal challenges." *Id.* (quoting *Sprint*, 571 U.S. at 81).

According to a status report filed by Defendants, the Ulster County Supreme Court issued an Order and Judgment in the City's favor on January 6, 2026.[11] (Dkt. No. 19; Dkt. No. 19-1).

---

[11] Plaintiffs request that the Court strike this status report. (Dkt. No. 20). Plaintiffs' request is denied.

28

However, *Younger* abstention is evaluated at the time of filing and there is no question that the state court action was pending at the time this action was filed. *See Gristina v. Merchan*, 131 F.4th 82, 87 (2d Cir. 2025) (rejecting dissent's argument that *Younger* should be "inapplicable if the state court proceedings . . . become final *at any point* during the federal proceeding," explaining that "[o]ur Court's case law . . . clearly indicates that the *Younger* abstention issue is evaluated at the time of filing, and it is not continuously re-evaluated throughout the pendency of a proceeding"); *see also New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 369 (1989) ("For *Younger* purposes, the State's trial-and-appeals process is treated as a unitary system, and for a federal court to disrupt its integrity by intervening in mid-process would demonstrate a lack of respect for the State as sovereign.").

As to the second factor, "[c]ourts in this circuit routinely recognize" the state interest in regulating zoning and land use as "an important state interest." *Jagoda*, 2025 WL 3672555, at *5, 2025 U.S. Dist. LEXIS 262018, at *12 (citing *Novie v. Vill. of Montebello*, No. 10-cv-9436, 2012 WL 3542222, at *12, 2012 U.S. Dist. LEXIS 115948, at *37 (S.D.N.Y. Aug. 16, 2012) (collecting cases)). Regarding the third factor, "abstention is appropriate where the plaintiff has an 'opportunity to raise and have timely decided by a competent state tribunal' the constitutional claims at issue in the federal suit," and "any uncertainties as to the scope of state proceedings or the availability of state remedies are generally resolved in favor of abstention." *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 77–78 (2d Cir. 2003) (quoting *Middlesex*, 457 U.S. at 437)). Chestnut Hill does not claim it could not raise its federal civil rights claims (or state law claims) in the state action. *See id.* at 78 (observing "to avoid abstention, [a party] must demonstrate that state law bars the effective consideration of constitutional claims."); *see also, e.g., Town of Huntington v. Park Shore Country Day Camp of Dix Hills, Inc.*, 47 N.Y.2d 61, 64

(1979) (recounting as part of procedural history that the "town . . . instituted this action to enjoin Park Shore from operating the tennis courts for commercial purposes" and that "[b]y way of counterclaim, Park Shore sought a declaration that the zoning ordinance was unconstitutionally discriminatory"). The Court therefore concludes that the *Middlesex* factors also weigh in favor of abstention. However, this does not end the inquiry

"[E]ven if *Younger's* prerequisites are satisfied, a federal court may exercise jurisdiction if the plaintiff can make a showing of 'bad faith, harassment or any other unusual circumstance that would call for equitable relief.'" *Lowell v. Vermont Dep't of Child. & Fams.*, 835 F. App'x 637, 639 (2d Cir. 2020), *as amended* (Dec. 15, 2020) (quoting *Falco v. Justices of Matrimonial Parts of Supreme Ct. of Suffolk Cnty.*, 805 F.3d 425, 427 (2d Cir. 2015)). To demonstrate bad faith, a plaintiff must show that relevant state proceeding "was initiated with and is animated by a retaliatory, harassing, or other illegitimate motive." *Diamond "D" Const. Corp.*, 282 F.3d at 199. "[T]he party bringing the state action must have no reasonable expectation of obtaining a favorable outcome." *Id.* (quotation omitted). "A state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception." *Id.* "A plaintiff asserting bad faith prosecution as an exception to *Younger* abstention must allege specific facts to support an inference of bad faith." *Saunders v. Flanagan*, 62 F. Supp. 2d 629, 634 (D. Conn. 1999) (citation omitted).

Although the Complaint asserts retaliation as a cause of action and the Court is well acquainted with the acrimonious nature of the parties' relationship, Plaintiffs have not argued the bad faith exception applies here, and the Court concludes they fail to identify specific facts that

would support an inference of bad faith. The Court therefore concludes that this is one of the narrow and exceptional circumstances where *Younger* abstention is appropriate.

Accordingly, Chestnut Hill's requests for declaratory and injunctive relief in connection with its remaining claims are dismissed under *Younger*. *See Sendlewski v. Town of Southampton*, 734 F. Supp. 586, 590 (E.D.N.Y. 1990) ("Where injunctive relief that would interfere with pending state proceedings would be barred, declaratory relief, absent unusual circumstances, is also barred." (citing *Samuels v. Mackell*, 401 U.S. 66, 73 (1971)). However, since *Younger* does not bar Chestnut Hill's claims for monetary damages, the Court will stay Chestnut Hill's claims (with the exception of the New York State Constitution claim discussed below), for monetary relief pending the resolution of the state proceedings. *Kirschner v. Klemons*, 225 F.3d 227, 238 (2d Cir. 2000) (observing that "a stay of the action [for monetary damages] pending resolution of the state proceeding may be appropriate"); *Torres v. Gaines*, 130 F. Supp. 3d 630, 637 (D. Conn. 2015) (finding the application of *Younger* appropriate to stay the action where "the resolution of the claims for monetary damages" would place "the Court in the awkward position of having to question the validity of the underlying state proceedings").

Having resolved the City's *Younger* argument in favor of abstention, the Court must consider how abstention impacts the three individual Plaintiffs, none of whom are named in the state court action. The Second Circuit has cautioned that "[i]n applying *Younger* to third-parties, courts should be sensitive to the fact that, 'abstention from the exercise of federal jurisdiction is the narrow exception, not the rule,' and that there is 'no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.'" *Spargo*, 351 F.3d at 82–83 (citation omitted) (first quoting *Cecos Int'l, Inc. v. Jorling*, 895 F.2d 66, 70 (2d Cir. 1990); and then quoting *Zablocki v. Redhail*, 434 U.S. 374, 380 n.5 (1978)). However,

31

where "the legal analysis of the plaintiffs' claims are unavoidably intertwined and inseparable," *Younger* abstention may extend to third parties. *Id.* at 84. Defendants have not addressed this issue and given the variety of claims, some of which may be derivative of Chestnut Hill's, (e.g., First Amendment claim that prohibition on having a sign on the residence is impermissible content-based regulation), while others may be wholly independent and individual, (e.g., Fourth Amendment unlawful search of individual Plaintiffs' residence), the Court declines to do so without further briefing.

E.    **New York State Constitution Claims[12]**

"Federal courts in this circuit have [ ] uniformly held that no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution." *Alwan v. City of New York*, 311 F. Supp. 3d 570, 586 (E.D.N.Y. 2018). "[W]here a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed." *Talarico v. Port Authority of New York and New Jersey*, 367 F. Supp. 3d 161, 171 (S.D.N.Y. 2019) (citations omitted); *see also Flores v. City of Mount Vernon*, 41 F. Supp. 2d 439, 447 (S.D.N.Y. 1999). Accordingly, Plaintiffs' claims under the New York State Constitution are dismissed.

---

[12] Defendants argue that the Court should decline to exercise supplemental jurisdiction over the state law claims in the event all federal claims are dismissed and that the Complaint fails to state a plausible claim for relief under the NYSHRL and New York State Constitution. (Dkt. No. 12-1, at 23–26). As the individual Plaintiffs' federal claims remain at this juncture, supplemental jurisdiction is still available. As to the individual Plaintiffs' purported claims under the NYSHRL, the Court notes that the allegations in the Complaint appear to be asserted wholly as to, and on behalf of, Chestnut Hill and that the Complaint does not connect those claims with the individual Plaintiffs. The parties should address this in any further motion practice.

32

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 12) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that, as described in this decision, the First Cause of Action alleging FHA discrimination with respect to the Special Permit, is dismissed as to the City, ZBA, Planning Board, and the individual Defendants in their official capacities; and it is further

**ORDERED** that Chestnut Hill NY, Inc.'s remaining claims for injunctive and declaratory relief are **DISMISSED** pursuant to *Younger*; and it is further

**ORDERED** that Chestnut Hill NY, Inc.'s claims for monetary relief are **STAYED** pursuant to *Younger*; and it is further

**ORDERED** that Plaintiffs' claims under the New York State Constitution are **DISMISSED** without prejudice; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 12) is otherwise **DENIED**; and it is further

**ORDERED** that Defendants are granted leave to file a renewed motion to dismiss regarding the issues the Court identified in this Order, including preclusion issues and the impact of *Younger*, if any on the individual Plaintiffs' claims, and the impact of the State Court's January 6, 2026 decision.[13] However, the parties are first directed to meet and confer and file a status report by April 3, 2026, addressing whether they are able to resolve any issues so as to avoid any unnecessary briefing. Any renewed motion to dismiss must be filed by April 20, 2026.

---

[13] Defendants refer to the *Rooker-Feldman* doctrine in a footnote, (see Dkt. No. 12-1, at 22 n.17), but as neither party has briefed the impact, if any, of the *Rooker-Feldman* doctrine on this case, the Court does not address it here. However, to the extent the parties believe it is applicable, they should address the doctrine in any further briefing.

33

Any briefing must specifically address the impact of claim preclusion and abstention on the

individual Plaintiffs and the individual Defendants.

     **IT IS SO ORDERED.**

Dated: <u>March 18, 2026</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

34